322 So.2d 1 (1975)
DEPARTMENT OF REVENUE of the State of Florida, et al., Appellants,
v.
Harriet L. GOLDER, As Executrix of the Estate of Max Lavin, Deceased, Appellee.
No. 47057.
Supreme Court of Florida.
October 15, 1975.
On Reconsideration November 24, 1975.
Robert L. Shevin, Atty. Gen., and E. Wilson Crump, II, Asst. Atty. Gen., Tallahassee, for appellants.
Stuart W. Patton and Daniel G. LaPorte, of Patton, Kanner, Nadeau, Segal, Zeller & LaPorte, Miami, for appellees.

ORDER
ENGLAND, Justice.
Appellee's counsel has requested that I disqualify myself from participation in this proceeding on the ground that I may possibly lack complete impartiality. The issues raised by this request are broader than this lawsuit, and they require a personal judgment with which others might reasonably disagree. My perception of my responsibility in the area of judicial ethics dictates that I publish both my decision on counsel's request and my reasons for that decision.
I believe it essential that judges contemplate the appearance of partiality at every *2 turn. The acceptance of court-made justice delivered by imperfect humans relies heavily for its existence on the respect of the citizenry for those who dispense it. In order for the courts to remain as a civilized alternative to less acceptable means of resolving disputes, the public in general, and parties and their counsel in particular, must be reassured regularly that causes brought to the judiciary are decided on the law alone.
"Possessed of neither the purse nor the sword, [the judiciary] depends primarily on the willingness of members of society to follow its mandates."[1]
To that end, I believe it appropriate to express my views in this fully public manner.
This case was filed with the Court shortly after I became one of its members.[2] The principal legal issue in the proceeding involves the constitutionality of an estate tax statute enacted by the Florida Legislature in 1971.[3] At the time of the enactment of this statute, I was serving as special tax counsel to the Florida House of Representatives, and in that capacity I prepared for the House Finance and Tax Committee a preliminary memorandum of law on the constitutionality of the then proposed enactment.[4] Beyond that familiarity with the statute, I have had no affiliation with this lawsuit, the parties, or their counsel.
Immediately prior to oral argument in this case, I filed of record in this proceeding and served on each counsel a Notice indicating my prior involvement with the statute and my familiarity with the constitutional question at issue. I indicated that I would consider a request for disqualification by counsel for either party, and pending such a request I neither questioned counsel during oral argument nor participated in the Court's preliminary, post-argument discussion of the case.
Shortly after oral argument, respondent's counsel requested my disqualification "in view of [my] preparation in 1971 of a legal memorandum concerning ... the very issue before the Court in this case."
At issue here is seeming "bias" in the form of a personal pronouncement on a point of constitutional law prior to commencing judicial service. Bias in this context, of course, does not connote the standard dictionary notion of "an inclination of temperament or outlook."[5] It means, rather, a bias of extra-judicial origin, such as would arise from a judge's association with an attorney, a party or a cause.[6] This form of bias is addressed in the Florida Code of Judicial Conduct, recently *3 adopted by this Court following its development and adoption by the American Bar Association.[7]
The basis for "bias" disqualification appears in Canon 3C(1) of the Code, which asserts as a general standard that
"a judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned... ."
Under that Canon, several specific situations are enumerated in which disqualification is required.[8] None of those situations apply here unless, by implication from its commentary,[9] subsection (1)(b) is considered applicable. That subsection requires disqualification of a judge who formerly served as counsel in the particular proceeding or was a member of the law firm which served as counsel in the proceeding. The commentary to that subsection states that
"a judge formerly employed by a governmental agency .. . should disqualify himself in a proceeding if his impartiality might reasonably be questioned because of such association."
In considering whether that commentary suggests disqualification as a result of my prior governmental association, I have considered principally its placement and purpose. Placement of the commentary suggests that its applicability should be confined to situations described in the subsection to which it relates, namely cases in which the judge has some prior affiliation with the same proceeding. Under ordinary rules of judicial construction, the commentary would not expand the specific prohibition of the subsection itself.[10] Reliance on statutory construction techniques alone is unnecessary, however, in light of the purpose for the commentary. This can be inferred from the reporter's notes to the ABA draft code which served as the verbatim model for this subsection and most of the other provisions in Florida's Code.[11] Describing subsection 3C(1)(b) and its governmental affiliation commentary, the reporter states:
"Canon 3C(1)(b) sets the standard for problems that arise most often for a new judge. A judge should not sit in a proceeding in which he has been a witness or has acted as a lawyer. The Committee was of the opinion that he should also disqualify himself in a proceeding if a lawyer with whom he previously practiced law was a witness or served as a lawyer concerning the same matter during such association. The Commentary clarifies the status of a judge who was formerly a lawyer in a governmental agency. An agency  for example, the Justice Department  is not fully equated with a private law firm, in that a former agency lawyer is not considered to have been associated with all other lawyers in the agency. If the former agency lawyer, now a judge, served as a lawyer in the matter in controversy, he is disqualified."[12]
It is apparent that Canon 3C(1)(b) is directed to disqualification based upon prior contacts with a proceeding, and not as a result of general familiarity with a particular *4 legal issue. Since the present controversy is not a matter in which I had been involved as counsel or witness, subsection (1)(b) does not apply to require my disqualification. No other disqualifying subsection of Canon 3C(1) even remotely bears on the inquiry in this case.
The question of disqualification, however, requires more than a conclusion that the specific examples under Canon 3C(1) are not applicable. The examples are that only, and not an exclusive catalog. As indicated in the reporter's notes on governmental affiliation, the non-specific, general standard of reasonably perceived impartiality must still be considered.[13]
The specific problem of prior governmental pronouncements or expertise was apparently considered by the framers of Canon 3C(1). The subject is specifically mentioned in the reporter's notes to subsection (1)(a), which in its present form deals only with bias concerning a party and personal knowledge of disputed evidentiary facts. The reporter states:
"Subsection (a) has gone through several formulations in drafting. At one time the language provided for disqualification if a judge `had a fixed belief concerning the merits.' It was intended that a judge disqualify himself if he had made up his mind on the merits before he heard the case. The Committee was confronted, however, by the interpretation of many able judges and law professors that would require a judge to disqualify himself if he had a fixed belief about the law applicable to a given case. For example, it was argued that a judge with a fixed belief that the First Amendment precludes a libel action by a public official against a newspaper in the absence of proof of malice should disqualify himself in a libel case of that general character. This interpretation was not intended; indeed, the Committee recognized the necessity and the value of judges' having fixed beliefs about constitutional principles and many other facets of the law."[14] (emphasis supplied)
It would appear from this commentary that the ABA's drafting committee specifically rejected the notion that judges should disqualify themselves for previously developed or expressed legal expertise. This view is consistent with the view of this Court regarding the responsibility of a judge in like circumstances under prior judicial canons. See Dade County Bd. of Pub. Instr. v. Michigan Mutual Liab. Co., 169 So.2d 483 (Fla. 1964).
Beyond the specific and the general standards of judicial conduct codes, or any express laws on the subject,[15] the matter of judicial disqualification necessarily involves personal, judgmental considerations. I suppose these concerns are evoked because litigants will inevitably bring causes before jurists whose prior analysis of the law is at odds with a result one of the parties seeks to achieve. Such an occurrence immediately raises concern as to whether a studied view of a particular point in the law, whether developed before or after the onset of judicial service, is not a form of "bias" for which disqualification is the most suitable remedy.
These concerns quite frequently manifest themselves, as here, in the form of an apparent predisposition towards a given legal result as a consequence of prior governmental service. They have been most evident with respect to Justices of the United States Supreme Court. The resolution from that bench has been uniformly against disqualification, in the absence of *5 any direct, prior participation in the particular proceeding.
"Justices disqualify in government cases when they have been directly involved in some fashion in the particular matter, and not otherwise... . The disqualification is limited to the particular department with which the person has been connected  that is to say, Justice Goldberg did not disqualify in a non-labor case coming from the Department of Justice when he was Secretary of Labor. Any other rule would make it useless to appoint government lawyers at all. More important, Justices who have come from the government do not disqualify merely because the particular matter involves a policy which, when in the government, they may have helped to form. The Justices who come from the House or the Senate do not disqualify from the interpretation of statutes which they may most actively have helped to write. Chief Justice Vinson wrote on tax matters and Justice Black on Fair Labor Standards Act cases, though each was particularly involved with those laws. Other examples could be endless."[16]
Perhaps one reason that prior legal expertise has not suggested disqualification to these Justices or to the ABA's drafting committee is that litigants in our system of jurisprudence should not be afforded the right to select their own judges. This point was recently addressed in a report prepared by the Judiciary Committee of the United States House of Representatives to accompany and explain the new federal disqualification statute:[17]
"... in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a reasonable basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a `reasonable fear' that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judge of their own choice."
The same point was also made by Mr. Justice Rehnquist in response to a suggestion of his disqualification on the ground (among others) that he had previously expressed a public view on a constitutional question brought to the Court following his appointment. In a memorandum opinion rejecting the suggestion of disqualification[18] he observed:
"Every litigant is entitled to have his case heard by a judge mindful of [his] *6 oath [of office]. But neither the oath, the disqualification statute, nor the practice of the former Justices of this Court guarantees a litigant that each judge will start off from dead center in his willingness or ability to reconcile the opposing arguments of counsel with his understanding of the Constitution and the law. That being the case, it is not a ground for disqualification that a judge has prior to his nomination expressed his then understanding of the meaning of some particular provision of the Constitution."
Thus, it does not appear essential (and in practical effect it does not appear desirable) that judges should decide only those cases in which they lack all knowledge of the legal issues brought before them. Indeed, as Mr. Justice Rehnquist observed:
"Proof that a Justice's mind at the time he joined the Court was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias."[19]
To these general views can be added the observation that in Florida, where Supreme Court Justices are elected, proof that a candidate for Justice lacks some acquaintance with constitutional law might very well prevent attaining judicial service altogether.[20]
In this case, I invited the inquiry regarding disqualification. Having analyzed counsel's suggestion and found no clear directive for disqualification, my decision becomes in the last analysis a choice between competing policies. On the one hand, there is unquestionably a judicial "duty to sit" in all cases, so long as it is feasible for me to do so.[21] On the other hand, there is an unsettling appearance that I am predisposed to a given legal result which I developed before I began my judicial service. As between the two policies, I have little difficulty making the choice so long as the apparent predisposition is based solely on my prior analysis of the law for purposes unconnected with this particular lawsuit, the parties or their counsel.
In this case, the views I expressed in 1971 as to the constitutionality of this estate tax provision were evolved independently of any particular controversy or party. I am not so pre-committed to them that I cannot be persuaded to the contrary. Accordingly, consistent with the views of Chief Justices Marshall, Chase and Hughes, and with Justices Holmes, Black, Harlan, Frankfurter, Jackson and Rehnquist,[22] I decline to step aside.[23]

ON RECONSIDERATION
At appellee's request I have reconsidered my decision not to disqualify myself in this *7 proceeding. I can find no reason to recede from the opinions I expressed in my order of October 15, or from the conviction that my participation in this case in no way violates the spirit or the letter of the Florida Code of Judicial Conduct. Under the totality of circumstances now present in this case, however, I do not believe that I can participate in any decision on the merits of this case without creating, in the public's view, concern for the integrity of the Court's decision. I therefore disqualify myself in this case.

ON RECONSIDERATION
PER CURIAM.
On October 27, 1975, counsel for appellee filed a motion, together with a memorandum of law, requesting that Justice England reconsider an opinion-order in this proceeding dated October 15, in which he declined to disqualify himself from participation. Appellee's lengthy memorandum of law, containing numerous citations of authority, frankly states that it is "couched in argumentative terms."
In this case, as in Department of Revenue v. Leadership Housing, Inc., Fla., 322 So.2d 7, appellee's memorandum of law inadvertently created an intolerable adversary atmosphere between appellee and Justice England after his decisional order on disqualification was entered. Appellee did not request our review of Justice England's original decision, and none is required in light of his decision on reconsideration, but we incorporate in this proceeding by reference to our per curiam opinion today in Leadership Housing, the views there expressed for future disqualification situations.
ADKINS, C.J., and ROBERTS, BOYD, OVERTON, ENGLAND, SUNDBERG and HATCHETT, JJ., concur.
NOTES
[1] Kaufman, Lions or Jackals: The Function of a Code of Judicial Ethics, 35 Law and Contemp.Prob. 3, 5 (1970).
[2] On September 10, 1974, I was elected to the Court for a term which began on January 7, 1975. This case was filed on March 13, 1975. Briefs were filed in due course, after which oral argument was scheduled for September 9, 1975.
[3] Chapter 71-202, Laws of Florida, now appearing as Section 198.02, Fla. Stat. (1973).
[4] In August, 1970, House Speaker Schultz appointed a Select Revenue Study Committee of the Florida House of Representatives. That Committee issued its final report on February 24, 1971, and a copy of that report is on file with the Clerk of the Florida House of Representatives. One of the Committee's recommendations was the "passage of a statute to allow Florida to receive a pro-rata share of the federal tax credit for residents as well as non-residents." The Committee implemented this recommendation by pre-filing a bill for the 1971 Regular Session. Subsequently I was asked to prepare a memorandum of law as to the constitutionality of the proposed enactment. The bill which later was enacted by the Legislature and became law was, for present purposes, identical to the one analyzed in my preliminary memorandum.
[5] Webster's Third New International Unabridged Dictionary 211 (1968); Frank, Disqualification of Judges: In Support of the Bayh Bill, 35 Law and Contemp.Prob. 43, 48 (1970).
[6] Cf., Craven v. United States, 22 F.2d 605, 607 (1st Cir.1927).
[7] In re The Florida Bar  Code of Judicial Conduct, 281 So.2d 21 (Fla. 1973). The entire Code, and its accompanying commentary, are reproduced in 32 Fla. Stat. Ann. (Supp. 1975), beginning at p. 131.
[8] The prohibitions of the Canons are mandatory where they are specifically applicable. Fla.Bar Code Jud.Conduct, Preface.
[9] "The commentary is included for purposes of construction and understanding." Fla.Bar Code Jud.Conduct, Preface.
[10] Cf. Farrey v. Bettendorf, 96 So.2d 889, 893 (Fla. 1957).
[11] E. Thode, Reporter's Notes to Code of Judicial Conduct (1973), a project sponsored by the American Bar Association and the American Bar Foundation.
[12] Thode, supra note 11 at 63.
[13] "The judge is disqualified also if his association with an agency lawyer now before the court or his association with the matter in controversy leads to the conclusion that, under the general standard of Canon 3C(1), his impartiality might reasonably be questioned." Thode, supra note 11 at 63.
[14] Thode, supra, note 11 at 61.
[15] Florida's disqualification statutes are not involved in this proceeding in any way. See Sections 38.01, 38.02, and 38.10, Fla. Stat. (1973).
[16] Frank, supra note 5, at 50.
[17] House Report No. 93-1453, 3 U.S.Cong. & Admin.News, pp. 6351, 6355 (11/8/74), relative to Pub.Law 93-512, 88 Stat. 1609 (1974). It is interesting to note that, while the new statute adopted the disqualification provisions of the ABA's new Code virtually intact (House Rep. No. 93-1453, supra at 6353), Congress added a wholly new provision addressed specifically to judges with prior governmental affiliations. Insofar as is relevant here, the new provision requires disqualification only "where he has served in governmental employment and in such capacity ... expressed an opinion concerning the merits of the particular case in controversy." (emphasis added) 28 U.S.C. § 455 (b) (3). This provision "is intended to cover the situations which can occur during the first two or three years of judicial service of a lawyer who is appointed to the bench from service as a government lawyer. This situation occurs more frequently in the federal judicial system than it does in state judicial systems and for this reason the committee believes that the federal statute should be more explicit than are the minimum standards adopted by the ABA for application in all the states." House Rep.No. 93-1453, supra at pp. 6355-56.
[18] Laird v. Tatum, 409 U.S. 824, 838-39, 93 S.Ct. 7, 15, 34 L.Ed.2d 50 (1972).
[19] Laird v. Tatum, supra note 18 at 835, 93 S.Ct. at 14. Obviously, the notion that only uninformed judges should decide constitutional questions becomes increasing untenable with the length of judicial service.
[20] It is arguable, although counsel for the State has not done so in this case, that familiarity with a particular constitutional issue demands participation rather than disqualification in a state which has an elected judiciary, lest the Court be denied the very expertise which the electorate sought to provide.
[21] Fla. Const. art. V, § 13. See Edwards v. United States, 334 F.2d 360 (5th Cir.1964).
[22] Laird v. Tatum, supra note 18 at 831-33, 835-36, 93 S.Ct. 7; Frank, Disqualification of Judges, 56 Yale L.J. 605, 625 (1947).
[23] As I said in my original Notice to counsel, this decision is made without prejudice to respondent or its counsel by reason of having filed the request for my disqualification.