378 So.2d 1212 (1979)
In re ESTATE OF Perry CARLTON, Deceased.
Alberta Carlton HAYES et al., Petitioners,
v.
Lucy Jane Carlton ROGERS, Respondent.
No. 51413.
Supreme Court of Florida.
March 8, 1979.
Request for Recusal Denied January 10, 1980.
Rehearing Denied January 10, 1980.
John T. Brennan of Brennan, McAliley, Albury & Hayskar, Fort Pierce, B.K. Roberts of Roberts, Miller, Baggett & LaFace, Tallahassee, for petitioners.
Robert E. Jackson of Jackson & Clem, Vero Beach, for respondent.
The Petition for Writ of Certiorari reflected probable jurisdiction in this Court. We issued the Writ and have heard argument of the parties. After hearing argument and upon further consideration of the matter [See 348 So.2d 896 (Fla.App.)] we have determined that the Court is without jurisdiction. Therefore, the Writ must be and is hereby discharged and the Petition for Writ of Certiorari is dismissed.
It is so ordered.
ENGLAND, C.J., and OVERTON, SUNDBERG and HATCHETT, JJ., concur.
ADKINS, J., dissents with an opinion, with which BOYD, J., and MELVIN, Associate Justice, concur.
*1213 ADKINS, Justice, dissenting.
I dissent from the majority.
Justice James Alderman, while a circuit judge, found that Lucy Rogers, the adopted daughter of the intestate's deceased brother, Lindley Carlton, was not an heir at law of the intestate. The order contained the following:
The legal issue which the Court must determine is whether Mrs. Rogers is an heir-at-law of Perry Carlton, by virtue of her adoption by Perry Carlton's brother. This question must be determined as of April 4, 1970, because the rights of the heirs became vested and fixed upon that date.
On April 4, 1970, the Florida Probate Law, Florida Statutes, Section 731.30, provided in part as follows:
"An adopted child, whether adopted under the laws of Florida, or of any other state or country, shall be an heir at law, and for the purpose of inheritance shall be regarded as a lineal descendant of his adopting parents . ."
At that time, the Florida Adoption Law, Florida Statutes, Section 63.151, also provided in part as follows:
"By any judgment or decree of adoption the child shall be the child and legal heir of the adopting parent or parents, entitled to all rights and privileges and subject to all obligations, of a child born to such parent or parents in lawful wedlock."
It can reasonably be argued from the statutory language quoted above, that the Legislature intended to place an adoptive child within his or her adoptive family on the same basis as a natural child. It may also reasonably be contended that this statutory language, when read in conjunction with Florida Statutes, Section 731.23, which specifies the mode of intestate succession, would allow inheritance between an adoptee and the full range of his or her adoptive kindred. However, the Florida Supreme Court has taken a different view. In the case of In re Hewett's Estate, [153 Fla. 137,] 13 So.2d 904, Fla. (1943), the Court construing Section 731.30, Florida Statutes (1941), specifically held that within the adoptive family, intestate succession is strictly limited to inheritance by and from the adoptee and his or her adoptive parents. The only difference in the Statute, from 1943 to 1970, is that it was amended to allow inheritance by and from the adoptee and the other natural and adoptive children of the adoptive parent or parents.
In Hewett, the question was whether the adopted daughter of a first cousin of the deceased was entitled to share in the estate to the same extent that her adoptive father would have shared had he been living. The Court held that she could not; that an adoptee could not inherit by intestacy from any other adoptive kindred other than his or her adoptive parents.
Exactly the same legal point is presented in the instant case where the question is whether Mrs. Rogers, the adopted daughter of Perry Carlton's brother, is entitled to share in his estate to the same extent that her adoptive father would have shared had he been living. Under the holding of the Supreme Court in the Hewett case, she would not.
The district court of appeal reviewed this order and attempted to distinguish Hewett, supra, observing that the claimant in Hewett, though an heir-at-law and lineal descendant of his adopted father, could not claim to be a descendant of his adopted father's mother. The court distinguished Hewett because in the case sub judice the claimant was a descendant of the deceased brother of the intestate. She was therefore a lineal descendant of her adopted parent and entitled to share in the estate.
In Hewett, this Court said the claimant could not participate in the estate of the ancestors, "or other blood kin," Id. 13 So.2d at 907, but the district court in the case sub judice held the claimant could participate in the estate of the blood kin. This is clear conflict.
The fact that inclusion of the "blood kin" in the rule enunciated by the Hewett court may be considered dictum does not prevent *1214 the Court from taking jurisdiction. Twomey v. Clausohm, 234 So.2d 338 (Fla. 1970).
On the merits, I would adopt the reasoning of the Court in Hewett, when the Court said:
We might well say that what the legislature mainly had in mind in drafting this section was the extent and quality of an adopted child's inheritance from both its adopting parents and its natural parents, and the reciprocal right of inheritance from the adopted child  which latter right was given exclusively to the adopting parents, just the same as if the adopted child were "for the purpose of inheritance" regarded "as the lineal descendant of its adopting parents", which adopting parents assume the burden and legal duty of raising, training, educating and supporting the adopted child, and thus relieving the blood parents of this burden and expense.
This statute is very liberal in its provisions in behalf of the adopted child. Such child inherits from its adopting parents as if it were their own natural child, and likewise inherits from its natural parents. Why should the legislature be [construed] to have gone further and intended, by court-imposed implication, to give the adopted child the right to inherit from the adopting parents' ancestors or other blood kin? [Emphasis added.] The legislature should not be construed to have intended this unless the language of the statute makes it plain that such was the legislative intent  which we do not think it does. The statute says: "An adopted child * * * shall be an heir at law, and for the purpose of inheritance be regarded as a lineal descendant of its adopting parents * * *." So the words "heir at law" and "for the purpose of inheritance be regarded as a lineal descendant" are all limited and qualified by the words "of its adopting parents". We would be going too far if we should expand the language of this sentence to read: "of its adopting parents and their ancestors."
153 Fla. 137, 13 So.2d 904, 906-07 (1943).
The ruling of Hewett has, in effect, been reaffirmed in subsequent decisions of this Court and district courts of appeal that either followed it or distinguished it on the facts. Thus, in In re Poole's Estate, 153 Fla. 610, 15 So.2d 323 (1943), this Court relied on Hewett in ruling that the next of kin of the deceased wife of an intestate decedent who died without lineal descendants or blood relatives were entitled to inherit his estate rather than his adoptive cousins. And in In re Levy's Estate, 141 So.2d 803, 804 (Fla.2d DCA 1962), by ruling that section 731.30 did not cut off the preexisting right of an adopted child to inherit from collateral blood kindred, the Court reaffirmed the rule of Hewett that "the word `descendants' connotes those persons who are in the blood line of the ancestor" and that strangers who are adopted into the family "have only such added rights of inheritance as are given by statute." The Court noted also that the 1953 amendment to section 731.30, enacted after the decision in Hewett,
would not change the result of that case. It does enhance the inheritance rights of an adoptee to permit him to inherit from his adoptive brothers and sisters  but no further.
141 So.2d at 805. In re Levy's Estate, supra, was considered by the Court in Gessner v. Powell, 238 So.2d 101 (Fla. 1970), in disposing of an alleged conflict between the decision in that case and that of a district court of appeal ruling that an adopted minor child had no cause of action for the wrongful death of his natural father. In discharging the writ because no conflict, in fact, existed, this Court said:
The statement in In re Levy, supra, that the adoption statute does not "limit or take away rights already in existence" must be interpreted in context, namely, with respect to the right of adoptees to inherit from blood relatives as well as from their adoptive parents and adoptive brothers and sisters as expressly authorized by § 731.30, Fla. Stat. 1969.
Gessner v. Powell, 238 So.2d at 102. (Emphasis supplied). Most recently, in In re *1215 Estate of Wight, 263 So.2d 258 (Fla.2d DCA 1972), the trial court's denial of the right of an adopted child to inherit from an intestate adoptive cousin was per curiam affirmed on authority of Hewett.
The following appears in Atkinson on Wills, section 23 at 89 (2d ed. 1953):
Most courts have not been so liberal to the adopted child with respect to his inheritance from the ancestors or collateral kin of the predeceased adoptive parent. Thus, when intestate left a niece of the blood of one brother and a nephew by adoption of another brother, the latter took no interest in the estate. The theory of this decision is that while one may make a child his own by adoption, he cannot make him the relative of other persons by the same process. No doubt this is the prevailing view.
Decisions involving the right of an adopted child to inherit under the will of an adoptive parent's ancestor or other blood kindred in varying circumstances, have distinguished Hewett and, in effect, reaffirmed it as to intestate estates. Thus, in In re Baker's Estate, 172 So.2d 268, 269 (Fla.2d DCA 1965), the court noted that it was held in Hewett that:
Under the then applicable statute, an adopted child could not "inherit" from lineal or collateral kindred of the adoptive parent. This is the general rule followed by most jurisdictions. 2 Am.Jur.2d, Adoption § 106; 2 C.J.S. Adoption of Children § 63d; Annot., 43 A.L.R.2d 1183 (1955).
In affirming the ruling of the trial court that the "Hewett doctrine" was inapplicable to the facts in Baker, the court said:
In the instant case the appellee does not "inherit" the legacy from the testatrix. She takes as a lineal descendant of the legatee, by force of the [anti-lapse] statute, F.S.A. § 731.20. This is the position taken by other courts who have been presented with the question. 19 A.L.R.2d 1159, at page 1165.
172 So.2d 268, 270 (Fla.2d DCA 1965).
Similarly, in First National Bank of Miami v. Bobcik, 132 So.2d 299 (Fla.3d DCA 1961), involving the right of an adopted child to the principal of a testamentary trust as the "living descendant" of the beneficiary (her adoptive father) upon his death, the court emphasized that the adopted child did not take as the "heir or descendant of the testatrix" but because she "fits the description of the person who the will provides shall receive the principal of the fund" after the death of the beneficiary.
The Court's interpretation in Hewett of the legislative policy with respect to the rights of adoptees to inherit intestate property was not unique; it was the policy of almost every jurisdiction in this country under similar statutes to limit the right of inheritance of an adopted child, as to intestate property, to the estate of the adoptive parents. In an annotation in 43 A.L.R.2d 1185 (1955), concerning the rights of inheritance of an adopted child, the annotator states at page 1189 that:
Under statutes expressly providing in substance that the child shall be entitled to inherit or take property by succession from, or shall be "to all intents and purposes" the heir of, the adopting parent, but making no mention of inheritance or succession from kindred of such parent, it has been with great regularity that no right to inherit or take from kindred of the parent is conferred.
The many decisions cited and reviewed in support of the statement involved various classes of collateral kindred, including the parents, brothers, sisters, and cousins of an adopting parent. One reason for this policy was expressed in Gamble v. Cloud, 263 Ala. 336, 82 So.2d 526, 528 (Ala. 1955).
To accept the view of appellant is to hold that an adoptive parent may not only make another his heir, but he can also make an heir to his collateral kin without their knowledge and consent. There are many cases which refuse to accept such a construction of their statute ... The authorities are legion and the arguments all strongly oppose a different theory of construction.
Accord, Merritt v. Morton, 143 Ky. 133, 136 S.W. 133 (1911); Warren v. Prescott, 84 Me. *1216 483, 24 A. 948 (1892); (both cases cited in Hewett). Another reason for this policy, mentioned in Hewett, quoting Phillips v. McConica, 59 Ohio St. 1, 51 N.E. 445 (1898), was as follows:
"The ancestors of the adopter are presumed to know their relatives by blood, and to have them in mind in the distribution of their estates, either by will or descent, but they cannot be expected to keep informed as to adoption proceedings in the probate courts of the counties of this state; and to allow an adopted child to inherit from the ancestors of the adopter would often put property into the hands of unheard of adopted children, contrary to the wishes and expectations of such ancestors."
But, for whatever reason, the fact remains that the legislature had not seen fit to provide expressly that adoptees shall have the right to inherit the intestate property of an ancestor or other blood kin of the adopting parents, even though it must have known that no such right existed under the statute as interpreted in Hewett. (Amendments to the Probate Code made in 1973, 1974, and 1975 may have had that effect; however, those statutes are not relevant here and should not, of course, be interpreted by this Court in these proceedings.) And it is respectfully submitted that, in these circumstances, a judicial interpretation of the statute as it existed in 1970 that would be contrary to the interpretation made in Hewett would constitute judicial amendment of the statute.
In my opinion the decision of the district court of appeal should be quashed and the cause remanded with instructions to reinstate the order of the circuit judge.
BOYD, J., and MELVIN, Associate Justice, concur.

ON REQUEST FOR DISQUALIFICATION
PER CURIAM.
Petitioners have requested the disqualification of Justice Overton from participation in the decision on rehearing in this case, based on sections 38.02 and 38.10, Florida Statutes (1977), and Canon 3C(1) of Florida's Code of Judicial Conduct.
This Court's procedural treatment of requests for disqualification has not always been consistent. In two cases the non-challenged members of the Court ruled on the legal sufficiency of the request. Ervin v. Collins, 85 So.2d 833 (Fla. 1956); Ball v. Yates, 158 Fla. 521, 29 So.2d 729, cert. denied, 322 U.S. 774, 68 S.Ct. 66, 92 L.Ed. 359 (1947). More recent cases, however, have left the determination of disqualification to the discretion of the justice sought to be disqualified. Daytona Beach Racing & Recreational Facilities District v. Volusia County, 372 So.2d 417 (Fla. 1978); Department of Revenue v. Golder, 322 So.2d 1 (Fla. 1975); Department of Revenue v. Leadership Housing, Inc., 322 So.2d 7 (Fla. 1975), cert. denied, 434 U.S. 805, 98 S.Ct. 35, 54 L.Ed.2d 63 (1977).
Without expressing any opinion as to the overall legal sufficiency of the petitioners' request, their reliance on sections 38.02 and 38.10 is misplaced. These provisions, as framed, apply only to trial judges and not appellate judges. See Department of Revenue v. Golder, 322 So.2d 1, 4 n. 15 (Fla. 1975) ("Florida's disqualification statutes are not involved in this proceeding in any way."). Moreover, the statutes include no evidence of any legislative intent to the contrary. Cf. 28 U.S.C. § 455 (1976) (revised in 1948 so as to extend to United States justices as well as judges).
After due consideration, we now recede from Ervin and Ball and hold that each justice must determine for himself both the legal sufficiency of a request seeking his disqualification and the propriety of withdrawing in any particular circumstances. This procedure is in accord with the great weight of authority,[*] and it reenforces the modern view of disqualification as a matter which is "personal and discretionary *1217 with individual members of the judiciary... ." Department of Revenue v. Leadership Housing, Inc., 322 So.2d 7, 9 (Fla. 1975).
Petitioners' request for disqualification will be submitted to Justice Overton for his decision.
ENGLAND, C.J., ADKINS, BOYD, SUNDBERG and McDONALD, JJ. and MELVIN, Associate Justice, concur.
OVERTON, J., not participating in per curiam.

DENIAL OF REQUEST FOR RECUSAL
OVERTON, Justice.
Pursuant to sections 38.02 and 38.10, Florida Statutes (1977), and the Code of Judicial Conduct, Canon 3(C)(1), petitioners filed a suggestion that I disqualify myself or be disqualified from this cause on the grounds of my close friendship with a lawyer whose law firm had represented the respondent, the administrator of the estate in issue, but who are not attorneys of record in this cause. The knowledge of that personal friendship was known at the time of the second oral argument of this cause on April 11, 1978. The suggestion for disqualification, however, was not filed until March 27, 1979, after this Court had rendered its decision with my participation but while the matter was still pending for rehearing.
In accordance with the procedure established by this Court in Ball v. Yates, 158 Fla. 521, 29 So.2d 729 (1947), and Ervin v. Collins, 85 So.2d 833 (Fla. 1956), I submitted this suggestion for disqualification to the remaining members of this Court assigned to hear the merits of this cause without my participation and agreed to abide by their decision.
In Ball a suggestion to disqualify Justices Buford and Adams was made on the grounds that: (1) Justice Buford was friends with an attorney previously employed by the prevailing party, and (2) Justice Adams had financial dealings with a bank controlled by the prevailing party. As in the instant case, the unsuccessful party filed the suggestion after the Court's opinion was rendered and while the matter was pending on rehearing. Justices Buford and Adams voluntarily submitted the issue of disqualification to the remaining members of the Court. A special panel of the Court held that the suggestion was "in fact and in law ... inadequate and insufficient in substance." 158 Fla. at 532, 29 So.2d at 735. The Court stated that when no disqualification is shown, the matter of voluntary recusal is for the individual justice to determine. Both justices declined to recuse themselves and participated in the denial of the petition for rehearing.
In Ervin, a suggestion to disqualify Justices Thomas, Thornal, and O'Connell was made on the grounds that: (1) Justice Thomas and Governor Collins and their families "are close, intimate, and personal friends, and have been for many years," and (2) Justices Thornal and O'Connell were appointed by Governor Collins and were "strong personal and political friend(s) of the Governor." Id. at 833. A special panel of the Supreme Court held that the allegations in the suggestion were "not legally sufficient to constitute a basis for disqualification," but instead could be considered as being addressed to the "conscience of the respective Justices against whom the suggestions are directed." Justices Thomas, Thornal, and O'Connell declined to recuse themselves in the cause and participated on the merits. See Ervin v. Collins, 85 So.2d 852 (Fla. 1956).
Upon my submission of this matter, the Court receded from the procedure of Ball *1218 and Ervin and expressly found that sections 38.02 and 38.10, Florida Statutes (1977), were not applicable to appellate judges or justices. The Court stated it is a matter which is personal and discretionary with the individual judge or justice and thus resubmitted the matter to me for my determination.
The suggestion that a judge or justice disqualify himself presents a sensitive and difficult problem because the issue concerns the integrity of the Court and the resulting credibility of the judicial system as a whole. The instant case poses an even greater problem because the suggestion for disqualification was made eleven months after the petitioners had knowledge of the alleged grounds for disqualification and after the decision of the Court was rendered for a second time.
In reaching my determination, two questions must be considered: (1) whether the suggestion was timely filed, and (2) even if timely filed, whether the asserted circumstances of personal friendship are sufficient to require disqualification.
For the reasons which follow, I find that this suggestion for disqualification is legally insufficient and therefore must be denied.

Timeliness
The suggestion for disqualification asserts that I should disqualify myself because of my "extremely close association and friendship with Benjamin A. Bittan, Jr., Esquire, a member of the law firm of Willes, Bittan, and Willes, Fort Pierce, Florida, the actual attorneys from [sic] the Respondent, Lucy Jane Carlton Rogers, although not presently her attorneys of record herein." The record reflects that Mr. Willes was the firm representative in all matters pertaining to the estate and Mrs. Rogers although he received advice from his partner, B.A. Bittan, Jr. It further reflects that B.A. Bittan was best man in Justice Overton's wedding and that a close friendship has been continually maintained. The facts asserted by petitioners also reflect (1) Raymond E. Ford, one of the counsel for petitioners, had knowledge of Justice Overton's close relationship with B.A. Bittan at a time prior to this cause being filed initially in this Court, and (2) petitioner Charles H. Carlton had knowledge of Justice Overton's close relationship with B.A. Bittan at the time of the oral argument of this cause on April 11, 1978. The Court denied certiorari on March 8, 1979, approximately eleven months after oral argument. A petition for rehearing was filed on March 21, 1979, and on March 27, 1979, this suggestion for disqualification was filed.
It is a general rule of law that a party waives any grounds for disqualification of a judge or justice when the suggestion is not filed within a reasonable period of time after having knowledge of such grounds. The purpose of this timeliness requirement is to avoid the adverse effects on the other litigant and the problems of a retrial with its resulting costs and delay. Allowing a party to request disqualification after a decision has been rendered by the Court provides a second opportunity to achieve a favorable result when the first decision is adverse, an opportunity not available to the opposing party. Because of these factors, this rule of law has been strictly enforced in situations where there is knowledge of the grounds for disqualification before a decision but the suggestion for disqualification is not filed until after the court's decision is rendered. This general rule of law is reflected in part in the following cases: Oppenheimer v. Deutchman, 270 P.2d 52 (Cal. App. 1954) (statement alleging bias and prejudice of a judge filed after rendition of judgment was filed too late to be considered); State ex rel. Rathe v. Jefferson Parish School Board, 206 La. 317, 19 So.2d 153 (1944) (a motion to recuse a supreme court justice on rehearing was untimely where the party and her counsel participated in the original hearing with knowledge of facts on which the motion to recuse was based); City of Biloxi v. Cawley, 332 So.2d 749 (Miss. 1976) (trial judge did not err in refusing to recuse himself where the motion suggesting recusal was not made until after the final decree was entered); Broad Street Corporation v. Velco Mortgage Co., 135 N.J. Eq. 581, 39 A.2d 700 *1219 (1944), aff'd, 136 N.J. Eq. 513, 42 A.2d 704 (1945) (objections to the trial judge were not timely where they were not made until after the judge had rendered his decision); State v. Cline, 69 N.M. 305, 366 P.2d 441 (1961) (affidavit of disqualification was not timely filed when made after the district judge had judicially rejected requests made by a defendant in a criminal case).
In our own state, sections 38.02 and 38.10, Florida Statutes (1977), pertaining to the disqualification of trial judges, codify this general rule of law. Section 38.02 requires that a suggestion for disqualification must be filed not more than thirty days after the plaintiff's attorney has learned of such grounds of disqualification. Section 38.10 requires that the affidavit of disqualification be filed not less than ten days before the beginning of the term of court. In Data Lease Financial Corporation v. Blackhawk Heating & Pacific Co., Inc., 325 So.2d 475 (Fla. 4th DCA 1975), the district court held under the authority of section 38.10 that a motion to disqualify was not timely filed where the plaintiff had waited until after an unfavorable ruling to request the trial judge's recusal.
Given the clear authority of this general rule of law, I find this request for disqualification was waived by the petitioners' delay in submitting the suggestion until after this Court ruled on the cause.

Sufficiency
Even assuming the suggestion was timely filed, it appears clear that friendship with a lawyer whose law firm represents one of the parties but is not counsel of record in the cause does not in and of itself require disqualification of a judge or justice.
In Ervin v. Collins and Ball v. Yates, this Court held that personal friendship with an attorney or a party to the cause, or an attorney who had represented a party, was not sufficient to constitute a legal basis for disqualification.
Canon 3(C)(1) of the Code of Judicial Conduct,[1] adopted in 1973, pertains to the disqualification of a judge and states in part: "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned." In interpreting this provision, opinions rendered by judicial conduct committees have concluded that, absent some special circumstance, friendly relationships between judges and attorneys do not of themselves require disqualification.
The Committee on the Code of Judicial Conduct for United States Judges, in advisory opinion 11, had presented to it a situation where an attorney was a long-time friend of the judge and godfather of one of the judge's children. The judge asked the committee whether he should disqualify himself from cases where a party is represented by a member of this attorney's firm. The committee answered as follows:
The question regarding members or associates of the firm of the friend and godfather poses no problem. It cannot be that firms are precluded from practice before judges simply because members have judges for friends. Here again *1220 there may be special circumstances dictating disqualification, but a friendly relationship is not sufficient reason in itself.
In a related matter, Florida's Committee on Standards of Conduct Governing Judges, in its opinion 76-12, stated that a judge need not disqualify himself from cases of a law firm which employs the judge's son as a nonlegal employee in a nonlawyer, nondiscretionary position.
If friendship alone with a lawyer or member of a firm is a basis for disqualification, then most judges in rural and semi-rural areas and many in metropolitan areas would be subject to disqualification in a large number of cases.
In the instant case, one of the attorneys of record for the petitioners is a former justice of this Court and has personal friendships among the present members of this Court. That situation alone does not require members of this Court to disqualify themselves when his law firm brings matters before this Court for decision. The instant case is in fact more remote since the lawyer is neither counsel of record in the cause or the principle lawyer representing the party in other legal matters. I conclude that my disqualification is not required by either the law or the canons for judicial conduct.
Even though a suggestion for disqualification is legally insufficient, a judge may still voluntarily recuse himself if he believes it would be in the best interests for the administration of justice. Voluntary recusation has limited availability when, as in the instant case, disqualification is requested by an unsuccessful litigant after a judge or justice has participated in the decision adverse to the requesting party. To do so would adversely and unjustly affect the successful party in the cause. Voluntary recusation after the rendition of judgment would be justifiable only when the judge or justice honestly believes he or she can no longer fairly and impartially rule on the cause.
I believe that I can continue to properly consider the issues in this cause fairly and impartially, and, consequently, I have a duty not to recuse myself. To do otherwise would set a dangerous precedent.

ON PETITION FOR REHEARING
Upon consideration of the Petition for Rehearing filed by attorneys for petitioners, and reply thereto,
IT IS ORDERED by the Court that said petition be and the same is hereby denied.
ENGLAND, C.J., and OVERTON, SUNDBERG and McDONALD, JJ., concur.
ADKINS and BOYD, JJ. and MELVIN, Associate Justice, dissent.
NOTES
[*] See, e.g., Laird v. Tatum, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed. 50 (1972); Berger v. United States, 255 U.S. 22, 41 S.Ct. 231, 65 L.Ed. 481 (1921); Shadid v. Oklahoma City, 494 F.2d 1267 (10th Cir.1974); Grimes v. United States, 396 F.2d 331 (9th Cir.1968); Hawaii-Pacific Venture Capital Corp. v. Rothbard, 437 F. Supp. 230 (D.Hawaii), appeal dismissed, 564 F.2d 1343 (9th Cir.1977); Frank, Disqualification of Judges for Bias or Prejudice  A New Approach, 1972 Utah L.Rev. 377; Frank, Disqualification of Judges, 56 Yale L.J. 605 (1947); Note, State Procedures for Disqualification of Judges for Bias and Prejudice, 42 N.Y.U.L.Rev. 484 (1967).
[1] Canon 3(C)(1) reads in full:

A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
(b) he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter or the judge or such lawyer has been a material witness concerning it;
(c) he knows that he individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
(i) is a party to the proceeding, or an officer, director, or trustee of a party;
(ii) is acting as a lawyer in the proceeding.
None of the special instances set forth in the canon are applicable to the instant suggestion for disqualification.