336 S.E.2d 171

**STATE of West Virginia ex rel.
Robert F. COHEN, Jr.**

v.

**A. James MANCHIN, Secretary of State
of the State of West Virginia, William
T. Brotherton, Jr., Candidate for the
office of Justice of the Supreme Court
of Appeals of West Virginia, and Jo-
seph P. Condry, Financial Agent for
William T. Brotherton, Jr.**

**No. 16474.**

Supreme Court of Appeals of
West Virginia.

Nov. 21, 1984.

Concurring in Part and Dissenting
in Part July 12, 1985.

Dissenting Opinion Oct. 2, 1985.

**528**

Rebecca Baitty, Charleston, for Relator.

George Bailey, Charleston, for Manchin.

William T. Brotherton III, Charleston, for Brotherton.

MILLER, Justice:

In this mandamus proceeding, we were asked to direct A. James Manchin, the Secretary of State of the State of West Virginia, not to certify William T. Brotherton, Jr., on the November 1984 general election ballot as a candidate for the office of Justice of the Supreme Court of Appeals of West Virginia. The relator, Robert F. Cohen, Jr., is a citizen, taxpayer and legally qualified voter of the State of West Virginia, who contends that the respondent, Mr. Brotherton, has failed to properly file a financial report in compliance with W.Va. Code, 3–8–7. This matter was orally argued on October 2, 1984, and because of the time constraints connected with the ballots for the November election, we issued an order. We ruled against the relator's position and indicated that an opinion would follow explaining the reasons for our order.[1]

I.

Several preliminary matters need to be covered. First, upon the decision of Justice Sam R. Harshbarger to disqualify himself in this case, retired Justice Fred H. Caplan was recalled to participate in this case pursuant to Section 8 of Article VIII of the West Virginia Constitution.[2]

---

**1.** We have utilized this procedure in a number of cases where we were presented with an issue that required a prompt decision. *E.g., State ex rel. Manchin v. Lively,* 170 W.Va. 672, 295 S.E.2d 912 (1982); *State ex rel. Board of Education v. Rockefeller,* 167 W.Va. 72, 281 S.E.2d 131 (1981); *West Virginia Libertarian Party v. Man-*

chin, 165 W.Va. 206, 270 S.E.2d 634 (1980), *appeal dismissed sub nom. Citizen's Party v. Manchin,* 449 U.S. 802, 101 S.Ct. 46, 66 L.Ed.2d 5 (1980).

**2.** The material portion of Section 8 of Article VIII of the West Virginia Constitution states:

Before this case was presented on full argument, the relator filed a motion to disqualify Justice Richard Neely on the ground that he had been successfully nominated in the June primary election as the other Democratic nominee for this Court. The relator asserted that Justice Neely's primary campaign had been in opposition to the campaigns of Justice Harshbarger and Mr. Brotherton and, therefore, Justice Neely's impartiality might reasonably be questioned under Canon 3(C)(1) of the Judicial Code of Ethics.[3]

■ We have established law holding that where a motion is made to disqualify or recuse an individual justice of this Court, that question is to be decided by the challenged justice and not by the other members of this Court. *State ex rel. Matko v. Ziegler*, 154 W.Va. 872, 873–74, 179 S.E.2d 735, 737 (1971), *overruled on other grounds, Smoot v. Dingess*, 160 W.Va. 558, 236 S.E.2d 468 (1977). *See also Laird v. Tatum*, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (Rehnquist, J., memorandum on motion to recuse); *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of America*, 325 U.S. 897, 65 S.Ct. 1550, 89 L.Ed. 2007 (1945) (Jackson, J., concurring opinion on denial of petition for rehearing); *In re Estate of Carlton*, 378 So.2d 1212 (Fla.1979), *cert. denied sub nom., Hayes v. Rogers*, 447 U.S. 922, 100 S.Ct. 3013, 65 L.Ed.2d 1114 (1980); *Giuliano v. Wainwright*, 416 So.2d 1180 (Fla. Dist.Ct.App.1982); Frank, *Commentary*

"A retired justice or judge may, with his permission and with the approval of the supreme court of appeals, be recalled by the chief justice of the supreme court of appeals for temporary assignment as a justice of the supreme court of appeals, or judge of an intermediate appellate court, a circuit court or a magistrate court."

3. Canon 3(C)(1) provides, in part: "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned." The entire text of the relator's motion to recuse is:

"The Relator, Robert F. Cohen, Jr., by counsel, respectfully moves Justice Richard Neely to disqualify himself from the consideration or decision of this case, on the following grounds:

" (1) In his petition, the Relator asks this Court to order the Secretary of State to rescind his certification of William T. Brotherton, Jr., as one of the two Democratic party nominees for election to the office of Justice of the Supreme Court of Appeals, and to issue a new certification naming Justice Sam R. Harshbarger as a nominee in place of Mr. Brotherton.

" (2) On the May 5 Democratic party primary ballot, for the two available nominations for the office of Supreme Court Justice, Justice Neely was opposed by both Justice Harshbarger and Mr. Brotherton, as well as by Charles H. Damron. Justice Neely's campaign for nomination was necessarily in direct or indirect opposition to either Justice Harshbarger or Mr. Brotherton, or both of these candidates. Conversely, the campaigns of Justice Harshbarger or Mr. Brotherton, or both, were necessarily directly or indirectly opposed to Justice Neely.

" (3) In view of his very recent political campaign, in opposition to Justice Harshbarger or Mr. Brotherton, or both, Justice Neely's

'impartiality might reasonably be questioned,' and he should therefore disqualify himself in this proceeding. *Judicial Code of Ethics*, Canon 3C(1).

" (4) Although Justice Neely's status as a Democratic nominee in the general election is unquestioned, his actual election in November has not yet been assured. The Court's resolution of the issues presented in this case might well affect directly Justice Neely's position as a candidate in the general election. More specifically:

" (a) Should the Court rule that Mr. Brotherton is not entitled to have his name placed on the official general election ballot as a Democratic party nominee, the Court will be forced to determine whether Justice Harshbarger will become the nominee named on the ballot, or whether a vacancy will exist in the nomination.

" (b) If the Court rules that a vacancy exists, it is likely that there will be write-in campaigns on behalf of more than one candidate. Any write-in candidate in the general election will be directly opposed both by Justice Neely and by any other write-in candidates, and it is not inconceivable that the highest number of votes in the general election might be received by two write-in candidates.

" (c) Even if the Court should rule that the general election ballot will contain the names of two Democratic party nominees, the Court's decision on the identity of the second Democratic nominee could prompt a write-in campaign for one or more additional candidates.

"For these, and other possible reasons, Justice Neely's interest in his own reelection to office 'could be substantially affected by the outcome of the proceeding,' and he accordingly should disqualify himself from the case, *Judicial Code of Ethics*, Canon 3C(1)(c)."

*on Disqualification of Judges—Canon 3 C,* 1972 Utah L.Rev. 377; Frank, *Disqualification of Judges,* 56 Yale L.J. 605 (1947).

Justice Neely, deeming himself not disqualified, declined to recuse himself.

## II.

■ Although respondents do not question the relator's standing to bring this mandamus action, we touch briefly on our law in this area by referring to *State ex rel. Booth v. Board of Ballot Commissioners,* 156 W.Va. 657, 196 S.E.2d 299 (1973), where standing is discussed at some length. In *Booth,* a petition for a writ of mandamus was filed in this Court against the Mingo County Board of Ballot Commissioners. It sought to compel the commissioners to omit from the general election ballot the name of a candidate for the office of county assessor. In *Booth,* we cited Syllabus Point 1 of *Pack v. Karnes,* 83 W.Va. 14, 97 S.E. 302 (1918), *overruled on other grounds, State ex rel. Booth v. Board of Ballot Commissioners,* 156 W.Va. 657, 196 S.E.2d 299 (1972), where we held:

"A citizen, tax payer and voter has such interest as entitles him to maintain mandamus to compel a board of ballot commissioners to discharge their duties lawfully in respect to the preparation of ballots for a general election."

It should be noted that *Booth* limited *Pack* and several of our prior election mandamus cases by holding in Syllabus Point 12 that to the extent that such cases "hold that election *mandamus* may be employed

to vindicate all rights claimed by one aggrieved as a result of the conduct of an election or the procedures used therein, such decisions are expressly disapproved and overruled."[4]

The basis for the mandamus in *Booth* was a claim that there had been fraud in the conduct of the primary election. The relator, one of several unsuccessful candidates for assessor, had failed to demand a recount or to proceed with an election contest after the primary election. We held that a mandamus action was not the proper procedure in which to develop the issue of fraud.[5]

In this case, the relator has proceeded against the Secretary of State rather than the individual county ballot commissioners by virtue of W.Va.Code, 3–5–18. This statute requires the Secretary of State for any office of a "political division greater than a county" to certify to the clerk of the respective circuit courts the names of the candidates who should be "placed on the official ballot in the general election."[6] In Syllabus Point 5, in part, of *State ex rel. Maloney v. McCartney,* 159 W.Va. 513, 223 S.E.2d 607, *appeal dismissed sub nom., Moore v. McCartney,* 425 U.S. 946, 96 S.Ct. 1689, 48 L.Ed.2d 190 (1976), we recognized that with regard to an office embracing more than one county, the Secretary of State is a *proper party respondent* to test the eligibility of a candidate for such office:

"In West Virginia a special form of mandamus exists to test the eligibility to office of a candidate in either a primary or general election. The proper party

---

**4.** The full text of Syllabus Point 12 of *Booth* is:
"To the extent *State ex rel. Zickefoose v. West,* 145 W.Va. 498, 116 S.E.2d 398 (1960); *Adams v. Londeree,* 139 W.Va. 748, 83 S.E.2d 127 (1954); *State ex rel. Pack v. Karnes,* 83 W.Va. 14, 97 S.E. 302 (1918), insofar as they hold that election *mandamus* may be employed to vindicate all rights claimed by one aggrieved as a result of the conduct of an election or the procedures used therein, such decisions are expressly disapproved and overruled."

**5.** Syllabus Point 4 of *Booth* states:
"*Mandamus* may not be employed to prove a charge of election fraud occasioned through alleged after-hours voting. Such charges are

matters of factual determination, reviewable by writ of error or appeal or controllable in their method of determination by *mandamus.*"

**6.** The material portion of W.Va.Code, 3–5–18, is:
"The secretary of state shall certify, under the seal of the State, to the clerk of the circuit court of each county in which a candidate is to be voted for, the name of the candidate of each political party receiving the highest number of votes in the political division in which he is a candidate, and who is entitled to have his name placed on the official ballot in the general election as the nominee of the party for such office."

respondent in such special action in mandamus is the Secretary of State of the State of West Virginia in the case of an office to be filled by the voters of more than one county or the clerk of the circuit court in the case of an office to be filled by the voters of one county."

We also pointed out in Syllabus Point 6 of *Maloney* that the candidate whose eligibility is challenged should also be made a party respondent.[7]

■ In this case, the eligibility requirement that is raised arises from the following portion of W.Va.Code, 3–8–7:

"No candidate nominated at a primary election, who has failed to make a sworn statement as required by this article, shall have his name placed on the official ballot for the ensuing election, unless there has been filed by or on behalf of such candidate, or by his financial agent, if any, the financial statement relating to nominations required by this article."

In a technical sense, this statute is not a candidate eligibility statute; rather, it is designed to preclude an otherwise eligible candidate from having his name placed on the general election ballot for failing to comply with the financial disclosure provisions of our election law.[8]

■ Because of the breadth of our election mandamus remedy, resting as it does on the provisions of W.Va.Code, 3–1–45,[9]

we believe that it is available to challenge under W.Va.Code, 3–8–7, the status of a candidate who, it is claimed, has failed to properly file his financial statements.

### III.

Turning to the merits of the case, the relator's main contention is that Mr. Brotherton violated W.Va.Code, 3–8–7, by not including as an expenditure a $2,500 payment made to a Logan County political organization entitled "Democrats Against Higher Taxes" in his post-primary financial report. This organization filed a financial statement which disclosed a $2,500 contribution from "William T. Brotherton, Jr., Brotherton for Supreme Court Committee" on June 1, 1984.

At the time of the filing of this suit on September 21, 1984, the last financial statement filed by Mr. Brotherton's financial agent, Joseph P. Condry, was on June 8, 1984, three days after the June 5 primary election. The statement covered the period from May 24 to June 1, 1984. The $2,500 expenditure was not listed on this financial statement. On September 25, 1984, Mr. Brotherton's financial agent filed with the Secretary of State an amended financial statement which did report the $2,500 payment as an expenditure.

The relator's first argument is that the June 8, 1984 filing was not proper because,

---

**7.** Syllabus Point 6 of *Maloney* states:

"Where an action in mandamus is brought to test eligibility to office before a primary or general election it is proper to join as an original party respondent the real party in interest in order to avoid the delay attendant upon petitions to intervene and other procedural formalities which might frustrate the expeditious resolution of the case."

**8.** Respondent Brotherton claims that this provision in W.Va.Code, 3–8–7, is unconstitutional as creating an additional qualification on his right to candidacy, citing *Marra v. Zink*, 163 W.Va. 400, 256 S.E.2d 581 (1979), and *State ex rel. Bromelow v. Daniel*, 163 W.Va. 532, 258 S.E.2d 119 (1979). *Marra* involved a city ordinance establishing a one-year residency requirement for city council members. *Bromelow* dealt with an ordinance requiring a candidate for mayor or recorder to produce evidence of "bondability" before gaining ballot access. We need not decide this point since we find that W.Va.Code,

3–8–7, was not violated. However, other courts have held that this type of statute, which forfeits the right to appear on the general election ballot for failure to comply with financial disclosure requirements, does not create an additional unconstitutional qualification for an elected office. *State v. Marshall*, 633 P.2d 227, 232 (Alaska 1981); *Saari v. Gleason*, 126 Minn. 378, 382–83, 148 N.W. 293, 294–95 (1914), *reaffirmed, Pavlak v. Growe*, 284 N.W.2d 174, 177–78 (Minn.1979); *Laborer's Educational and Political Club—Independent v. Danforth*, 561 S.W.2d 339, 344 (Mo. 1977) (en banc); *State ex rel. La Follette v. Kohler*, 200 Wis. 518, 552–53, 228 N.W. 895, 907–08, 69 A.L.R. 348, 366–67 (1930).

**9.** The first sentence of W.Va.Code, 3–1–45, states: "Any officer or person, upon whom any duty is devolved by this chapter, may be compelled to perform the same by writ of mandamus." *See State ex rel. Underwood v. Silverstein*, 167 W.Va. 121, 278 S.E.2d 886, 888 (1981).

even though it was filed after the June 5 primary, the report did not comply with W.Va.Code, 3–8–5, which requires financial reports to set forth "all financial transactions which have taken place by the date of such report." [10]

■ It is difficult to determine what is meant by the phrase "date of such report," in view of the language utilized in other portions of W.Va.Code, 3–8–5, and on the official filing forms issued by the Secretary of State's office. On the last page of the official filing form, in Section G, there is the following certificate statement: "I further certify that this statement lists all financial transactions, as reported above in Sections C, D, and F, for the period beginning on the ____ day of _____, 19__, and ending on the ____ day of _____, 19__."

At the end of the last page of the form, there is the jurat where the notary indicates the date that the financial report was sworn to before him. As we have previously noted, the jurat was dated June 8, 1984, and the time periods set out in Section G of the involved financial statement covered the period of May 24 to June 1, 1984.

When W.Va.Code, 3–8–5, is read in its entirety, it is clear that it contemplates that a series of financial statements shall be filed. For example, and as it relates to this case, a preliminary financial statement is required by the last Saturday in March or within fifteen days thereafter next preceding the primary election day.[11] Then not less than five nor more than ten days before each primary or other election, a financial statement is required to be filed. A further financial statement is required within thirty days after each primary election.

We also note that the official financial statement form contains on the first page a series of blocks that identify the time periods in which the financial statement must be filed with the Secretary of State.[12] These time periods track the provisions of W.Va.Code, 3–8–5.

The obvious intent of the financial statement forms prepared by the Secretary of State is to accommodate these various filing requirements by leaving the time periods blank in Section G. The time period in Section G is tied to the candidate's expenditures and receipts schedule by its reference

---

**10.** The material portion of W.Va.Code, 3–8–5, states:

"Not less than five nor more than ten days before each primary or other election, and again within thirty days after each primary or other election, every candidate for nomination or election, and every financial agent ... shall file with the officers hereinafter prescribed a detailed itemized financial statement subscribed and sworn to before an officer authorized to administer oaths, setting forth all financial transactions which have taken place *by the date of such report* in connection with such primary or other election as provided for in section five-a [§ 3–8–5a] of this article." (Emphasis added).

**11.** See note 10 for the text of the third paragraph of W.Va.Code, 3–8–5. The relevant portion of the second paragraph, dealing with the March financial statement filing, is as follows:

"Each person who files a certificate of candidacy for nomination or election in this State as provided for in article five [§ 3–5–1 et seq.] of this chapter and every financial agent ... shall file, on the last Saturday in March or within fifteen days thereafter next preceding the primary election day, a detailed itemized statement, subscribed and sworn to before an officer authorized to administer oaths, setting

forth all contributions and expenditures concerning the candidacy of that person.... Such statement shall include all contributions received or expenditures made which have taken place by the date of such report, subsequent to any previous report filed within the previous five years under this section or under the former provisions of this section, or if no report was filed, all contributions received or expenditures made within the preceding five years. The specific information required to be included in such statement is provided for in section five-a [§ 3–8–5a] of this article."

**12.** This language is as follows:

"This statement is required to be filed according to the provisions of the West Virginia Code, 3–8–5. Check one of the following blocks:

[ ] On the last Saturday in March or within fifteen days thereafter next preceding the primary election day.
[ ] Not less than five nor more than ten days before the primary or other election.
[ ] Within thirty days after the primary or other election.
[ ] Not less than five nor more than ten days before the general election.
[ ] Within thirty days after the general election."

to Sections C, D, and F, but there is nothing on the official form that gives the date of the report. Furthermore, there is no express language in W.Va.Code, 3–8–5, that connects the date of the report to the period in which the report must be filed.

The date in the jurat section cannot be found to be "the date of such report" since it is only the date when the preparing party acknowledges the correctness of the report before a notary. The end date of the period covered in Section G might be a more likely candidate for the "date of such report," yet it only covers the financial transactions for the period covered in the report, which can end before the actual filing period because of the time needed to prepare the report and file it.[13]

The problem lies in the fact that the language in W.Va.Code, 3–8–5, which requires a financial report to set forth "all financial transactions which have taken place by the date of such report," has no definite connection to the filing time provisions in W.Va.Code, 3–8–5. The statute does not state that the date of a financial report shall be a definite date close to or within the mandatory filing period. The statute does not define the "date of such report," but states only the time periods in which the various reports must be filed, i.e., "on the last Saturday in March or within fifteen days thereafter next preceding the primary election day." W.Va.Code, 3–8–5. It does not identify when a particular report must be dated for purposes of reflecting the contributions and expenditures which, as the statute requires, must be as of the date of the report. We, therefore, conclude that as to the phrase "the date of such report," the statute is ambiguous.

■ We have not previously had occasion to address this problem presented by

W.Va.Code, 3–8–5. With regard to any statutory ambiguity, we begin with an ascertainment of the legislative intent as indicated by Syllabus Point 1 of *Pond Creek Pocahontas Co. v. Alexander,* 137 W.Va. 864, 74 S.E.2d 590, *appeal dismissed,* 346 U.S. 803, 74 S.Ct. 36, 98 L.Ed. 334 (1953):

> "The basic and cardinal principle, governing the interpretation and application of a statute, is that the Court should ascertain the intent of the Legislature at the time the statute was enacted, and in the light of the circumstances prevailing at the time of the enactment."

*See also Ohio County Commission v. Manchin,* 171 W.Va. 552, 301 S.E.2d 183 (1983); *Crockett v. Andrews,* 153 W.Va. 714, 172 S.E.2d 384 (1970).

■ In *Wooddell v. Dailey,* 160 W.Va. 65, 68, 230 S.E.2d 466, 469 (1976), we summarized some of the rules of statutory construction that we have utilized:

> "Effect should be given to the spirit, purpose and intent of the lawmakers without limiting the interpretation in such a manner as to defeat the underlying purpose of the statute; ... Each word of a statute should be given some effect and a statute must be construed in accordance with the import of its language; ... Undefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning." (Citations omitted).

■ We must assume that the legislature intended by having candidates file financial reporting forms at certain prescribed periods, which periods are sequential in time, that a particular form should include receipts and expenditures that begin at the closing date of the last report and should end at a date reasonably close

---

13. In the present case, the first report was filed on April 10, 1984, and the box on page one with the heading "[o]n the last Saturday in March or within fifteen days thereafter next preceding the primary election day" was checked. The report covered the period from March 29 to April 9, 1984. A second report was filed on May 29, 1984, and the box with the heading "[n]ot less than five nor more than ten days before the primary or other election" was checked. It covered the period from April 10 to May 24, 1984. The third report was filed on June 8, 1984, and the box titled "[w]ithin thirty days after the primary or other election" was marked. This report covered the period from May 24 to June 1, 1984.

to the period when the report is required to be filed.[14]

▓ There are substantial public policy reasons for requiring candidates and other persons engaged in the political process to file financial reporting forms, which have been elaborated at some length in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and which we summarize as follows. First, disclosure provides information as to the sources of the candidate's funds and where he spends them, thus, it permits the voter to evaluate the candidate's potential allegiances by being able to identify those who have contributed to his campaign, as well as those who have received money. Second, disclosure also exposes to the light of publicity the large contributions and expenditures, thus, deterring possible corruption and illegal expenditures. Finally, disclosure provides a means of detecting violations of contribution and expenditure limitations.[15]

▓ These policies can be easily frustrated if financial reporting forms are timely filed, but do not include contributions and expenditures that are near the date when the report is filed. We recognize that it may not be possible for the financial report to include receipts and expenditures as of the date it is filed because in certain Statewide and other elections, the contributions and expenditures may be substantial. The practical problems of compiling the report and verifying its contents may consume several days.

However, a candidate or his financial agent should not be able to select an arbitrary closing date on the reporting form in Section G, which is well in advance of the filing period and then delay filing the form to almost the end of the filing period, thereby substantially under reporting the actual contributions and expenses. This would deprive the electorate of any meaningful knowledge of the candidate's financial activities prior to an election.

The legislature could clarify this matter by requiring, for example, that the date of a financial report under W.Va.Code, 3–8–5, should be no earlier than the first day of the period when the form is required to be

**14.** Prior to the 1976 amendment to W.Va.Code, 3–8–5, *see* 1976 W.Va. Acts, Regular Session, Ch. 47, the time period for filing the pre-primary report was not less than seven nor more than fifteen days before each primary. This period was narrowed in 1976 to not less than five nor more than ten days. The narrowing of the period in which the pre-primary report could be filed was, we believe, an attempt on the part of the legislature to ensure that the pre-primary report would contain as much as possible the total amount of contributions and expenditures made before the primary election.

**15.** The entire quotation from *Buckley* is:

"First, disclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voter in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.

"Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return. And, as we recognized in *Burroughs v. United States*, [290 U.S. 534, 548, 54 S.Ct. 287, 291, 78 L.Ed. 484, 490 (1934)] ... Congress could reasonably conclude that full disclosure during an election campaign tends 'to prevent the corrupt use of money to affect elections.' In enacting these requirements it may have been mindful of Mr. Justice Brandeis' advice:

'Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.'

"Third, and not least significant, record-keeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above.

"The disclosure requirements, as a general matter, directly serve substantial governmental interests." 424 U.S. at 66–68, 96 S.Ct. at 657–58, 46 L.Ed.2d at 715. (Citations and footnotes omitted).

filed.[16] In the absence of such an amendment, we hold that the provisions of W.Va. Code, 3–8–5, relating to the filing of financial reports "setting forth all financial transactions which have taken place by the date of such report," must be taken to mean that the closing dates in Section G of the official reporting form issued by the Secretary of State of the State of West Virginia must be construed to be the date of the report, and such date must be reasonably close to the filing deadline for the report.

■ In view of the foregoing, we decline to accept the relator's argument relative to the date of the report and conclude that the questioned financial form filed on June 8, 1984, was valid since its closing date of June 1, 1984, was reasonably close to the earliest reporting date for the form, i.e., June 6, 1984.

## IV.

Another question raised by the relator is that the report filed on June 8, 1984, does not reflect the $2,500 payment made to the political committee in Logan County entitled "Democrats Against Higher Taxes." This payment was obviously one made in connection with the primary election, as illustrated by the explanation given by Mr. Brotherton's financial agent's supplemental filing made on September 25, 1984.[17]

The relator's argument on this point is that since Mr. Brotherton had originally made the payment of $2,500 to the Logan County committee by a personal check, it was incumbent on him to file a separate financial statement. The respondent, Mr. Brotherton, maintains that subsequently reporting this transaction through his financial agent was sufficient.

■ The appointment of a financial agent is recognized in W.Va.Code, 3–8–4.[18] His role vis-a-vis the candidate is not set out in detail in our campaign financial reporting statutes. It does appear that W.Va.Code, 3–8–7, clearly permits the filing of a financial statement by a candidate's financial agent in lieu of the candi-

**16.** We do not foreclose the Secretary of State, under his rulemaking authority, W.Va.Code, 3–1A–6, to revise the financial reporting forms to establish such reporting date. We have recognized that where an officer or agency has been delegated rulemaking power by the legislature, it may exercise the same to implement its statutory powers so long as they are not inconsistent with statutory provisions, as summarized in Syllabus Point 3 of *Rowe v. W. Va. Dept. of Corrections,* 170 W.Va. 230, 292 S.E.2d 650 (1982):

"It is fundamental law that the Legislature may delegate to an administrative agency the power to make rules and regulations to implement the statute under which the agency functions. In exercising that power, however, an administrative agency may not issue a regulation which is inconsistent with, or which alters or limits its statutory authority."

*See also Eastern Gas & Fuel Associates v. Hatcher,* 144 W.Va. 229, 237, 107 S.E.2d 618, 623 (1959).

**17.** The supplemental report contains the following statement:

"This figure was omitted from the original filing for this period because the Committee was unaware at that time that the candidate had written a personal check for $2,500 made payable to 'Democrats Against Higher Taxes' to be used in his behalf for expenses related to transporting voters to and from the polls and distributing printed matter. The candidate was reimbursed in the amount of $2,500 on June 8, 1984, by Committee check made payable to 'Democrats Against Higher Taxes' which was endorsed over to the candidate by Charles Gilliam, Treasurer for 'Democrats Against Higher Taxes'. This $2,500 expense to the Committee will be reflected in its next required financial disclosure not less than five nor more than ten days before the general election since it occurred after the reporting period covered by this report.

"The Committee's check was made payable to 'Democrats Against Higher Taxes' because it was anticipated that the Committee's check would replace the candidate's personal check. Because the candidate's personal check had already been deposited, the Committee check was endorsed over to the candidate by the payee in accordance with the Committee's intentions."

**18.** The material portion of W.Va.Code, 3–8–4, is:

"No person shall act as the treasurer of any political party committee, or as financial agent for any candidate for nomination or election to any office ... unless a written statement designating him as such treasurer or financial agent shall be filed with the secretary of state, at least sixty days before the election at which he is to act."

Under another portion of W.Va.Code, 3–8–4, a financial agent for a candidate running in a county election files his certificate with the clerk of the county commission.

date. Its key language is: "there has been filed by or on behalf of such candidate, or by his financial agent."[19]

■■■■■ We believe that our campaign financial reporting statutes do not require a candidate to file a separate financial statement so long as he utilizes a financial agent who reports all of the contributions and expenditures made for and on behalf of the candidate, including those made by the candidate personally. If the candidate chooses, he may elect to file his personal contributions and expenditures separately by filing his own financial statement.

From the financial statements filed in this case, it is apparent that the respondent, Mr. Brotherton, elected to operate his primary election campaign through his financial agent. His three financial reports disclose that approximately $142,460 had been contributed by numerous individuals and that he had expenditures of $122,-554.52.

The relator emphasizes that the failure to account for the $2,500 donation on the post-primary financial statement constitutes a violation of W.Va.Code, 3–8–7, which requires that the name of a candidate who has failed to file the requisite financial statements shall not be placed on the general election ballot.[20]

This provision has been part of our financial filing statutes for a considerable period of time. The relator places primary reliance on *Pack v. Karnes*, 83 W.Va. 14, 97 S.E. 302 (1918), *overruled on other grounds, State ex rel. Booth v. Board of Ballot Commissioners*, 156 W.Va. 657, 196 S.E.2d 299 (1973), and quotes in his brief this language from *Pack:*

"Thompson [the primary election winner] was voted for generally by members of his party throughout the county, but that because of his failure, as required by law, to file with the clerk of the county

court at least seven days before said primary election an itemized statement, subscribed and sworn to, setting forth all his financial transactions in connection with his candidacy, and because of his failure to file such sworn statement with said clerk at any time until eight days after said primary, he was not legally nominated by his party as a candidate for the House of Delegates and was not entitled to have his name printed or placed on the official ballot to be voted on at the general election on the 5th day of November, 1918." 83 W.Va. at 15, 97 S.E. at 303.

This language does not represent the holding of the Court, but was only a recitation of the legal contention of the petitioner in *Pack*, as the above quotation began with this phrase: "It is further *alleged* that at said primary." 83 W.Va. at 15, 97 S.E. at 303. (Emphasis added).

The actual holding of *Pack* was confined to a provision relating to the filing of a certificate of candidacy under what is now W.Va.Code, 3–5–7. This fact cannot be ascertained from the *Pack* decision, but only by its reference to an earlier case— *State ex rel. Lewis v. Board of Ballot Commissioners*, 82 W.Va. 645, 96 S.E. 1050 (1918):

"Now on the question of the right of respondents to remain on the ballot. As to Shanklin, nominated by the executive committee in place of Thompson, resigned, we have just decided that one who has not prior to the primary election filed with the clerk of the county court the affidavit required by the corrupt practice act, can not become the nominee of his political party, and that unless regularly nominated, the executive committee of his party can not on his resignation fill his place by nominating another as for a vacancy. *State ex rel. Lewis v. Board of Ballot Commissioners*, 82

---

**19.** The relevant portion of W.Va.Code, 3–8–7, is: "No candidate nominated at a primary election, who has failed to make a sworn statement as required by this article, shall have his name placed on the official ballot for the ensuing election, unless there has been filed

by or on behalf of such candidate, or by his financial agent, if any, the financial statement relating to nominations required by this article."

**20.** *See* note 19, *supra.*

W.Va. 645, [96 S.E. 1050 (1918)]." 83 W.Va. at 18–19, 97 S.E. at 304.

*Lewis* involved candidates who had neither filed a certificate of candidacy nor paid a filing fee. The Court found that these were both mandatory requirements under our then existing election statutes,[21] and summarized its holding in Syllabus Point 2:

"One who does not certify his candidacy to the clerk of the circuit court of the county, pay to the sheriff his assessment and have his name printed on the primary election ballot of the political party whose nomination for a county office he seeks, as required by the Primary Election Statute, does not become the nominee of such party by the voters thereof voting for him by simply writing or pasting his name on the printed ballot in a blank space that may have been left for that purpose, even though he may have been voted for without opposition, or may have received a larger number of votes than his opponents for the nomination."

However, we again stress that both *Pack* and *Lewis* did not deal with a statute similar to W.Va.Code, 3–8–7.

In *Varney v. County Court*, 102 W.Va. 325, 135 S.E. 179 (1926), a candidate brought a mandamus action against a canvassing board, which had refused to issue him a certificate of nomination even though he had received the highest number of votes in the primary election. The board refused to certify Mr. Varney as the nominee because he had failed to file an expense account as required under W.Va.Code, Chapter 5, §§ 8b(6) and (8) (1923), which were the counterparts to our present W.Va. Code, 3–8–5 and –7.[22] We stated in Syllabus Point 2 of *Varney:* "The fact that a candidate receiving the highest number of votes in a primary election has failed to file an expense account, as prescribed by sections 8b(6), and 8b(8), c. 5, Code, is no excuse for the refusal of a canvassing board to issue him a certificate of nomination."

It is not clear from the facts of *Varney* whether the candidate had failed to file any reports or was late in filing his reports. What is clear is that the main holding was given in Syllabus Point 1: "A county court, sitting as a canvassing board, has no authority to pass on the eligibility of candidates." We are not cited nor have we found any other case in our jurisdiction that bears directly on this issue.[23]

The relator places considerable reliance on *State v. Marshall*, 633 P.2d 227 (Alaska 1981), where the court held that a city councilman could not take office. He had failed to file his pre-election contribution and expenditure report until some nine days after the election. Under Alaska law,

---

**21.** Similar provisions requiring a certificate of candidacy and filing fee are found in W.Va. Code, 3–5–7 and –9.

**22.** The material portion of W.Va.Code, Ch. 5, § 8b(6) (1923), provided:

"Not less than seven nor more than fifteen days before each primary or other election, and again within thirty days after each primary or other election, every candidate for public office, (except in towns of less than five thousand population), and every financial agent, and the treasurer of every political committee, shall file with the officers hereinafter prescribed a detailed, itemized statement subscribed and sworn to before an officer authorized to administer oaths, setting forth all financial transactions in connection with such primary or other election."

The relevant provision of W.Va.Code, Ch. 5, § 8b(8) (1923), provided:

"No candidate nominated at a primary election who has failed to make a sworn statement as required by this act, shall have his name placed on the official ballot for the ensuing election, unless there has been filed by or on behalf of said candidate, or by his financial agent, if any, the financial statement relating to nominations required by this act."

**23.** *State ex rel. Bumgardner v. Mills*, 132 W.Va. 580, 53 S.E.2d 416 (1949), *State ex rel. Harmon v. Board of Canvassers*, 87 W.Va. 472, 105 S.E. 695 (1921), and *State ex rel. Hall v. County Court*, 87 W.Va. 437, 105 S.E. 693 (1920), all dealt with a different part of W.Va.Code, 3–8–7, which is worded as follows:

"It shall be unlawful to issue a commission or certificate of election, or to administer the oath of office, to any person elected to any public office who has failed to file a sworn statement as required by this article, and no such person shall enter upon the duties of his office until he has filed such statement, nor shall he receive any salary or emolument for any period prior to the filing of such statement."

a candidate's election could be voided if he violated any provision of its election law.

The Alaska court concluded that the failure to file a pre-election financial report until after the election would clearly frustrate the purpose of financial disclosure laws. It noted that other courts which had dealt with post-election financial reports had utilized a rule of substantial compliance. This is true not only as to timeliness, but also as to content. *Daniell v. Gregg*, 97 N.H. 452, 91 A.2d 461 (1952); *In Re Shapp*, 476 Pa. 480, 383 A.2d 201 (1978); *Lovelle v. Thornton*, 234 S.C. 21, 106 S.E.2d 531 (1959); *Branaum v. Patrick*, 643 S.W.2d 745 (Tex.App.1982); 29 C.J.S. *Elections* § 216(2) (1965).

█ The problem here is not an untimely filing, but a failure to include on the post-primary financial report the $2,500 expenditure to the Logan County political committee. It is obvious that the expenditure could not have appeared on the pre-primary financial report, since it was required to be filed no less than five days before the June 5 primary. This would have established May 31 as the latest filing date.

The failure to account arises because the post-election report was filed on June 8, 1984, but had a closing date in Section G of June 1, 1984. The report was filed within thirty days after the primary election date, i.e., three days after it. Because of the lack of a statutory definition relating to the phrase "by the date of such report" contained in W.Va.Code, 3–8–5, this report did not contain any post-primary contributions and expenses.

Certainly, clarity could be obtained by the insertion of language in W.Va.Code, 3–8–5, to the effect that the post-primary report should contain all contributions and expenses related to the primary election.

We acknowledge that a supplemental post-primary report was filed disclosing the $2,500 item and making other corrections of a minor nature to the post-primary financial report. Furthermore, the respondent financial agent did report prior to the general election post-primary contributions

and expenditures. The report was filed on November 1, 1984, and had a closing date of October 29, 1984.

We do not believe that any of our prior cases are controlling on this issue. We have pointed out that both *Pack* and *Lewis* dealt with the filing of the initial certificate of candidacy and not financial reporting forms under the former counterpart of W.Va.Code, 3–8–7. To the extent that *Varney* suggests that a candidate or his financial agent can file no financial reporting statement and not be subject to W.Va. Code, 3–8–7, it is disapproved.

What we do hold is that W.Va.Code, 3–8–7, is not violated where a candidate's financial agent files a post-primary financial statement which omits an item of expense and which expense could not have been placed on the pre-primary financial statement because it was incurred less than five days before the primary election and a supplemental post-primary statement is filed accounting for that expense.

### V.

█ The relator contends that the respondents have violated certain other provisions of our election law. These include W.Va.Code, 3–8–12(f), relating to the one thousand dollar maximum limit on contributions; W.Va.Code, 3–9–12, regarding payment to electors for influencing such electors' votes; W.Va.Code, 3–8–9, regarding authorized and unauthorized campaign expenditures; and W.Va.Code, 61–5A–7, regarding the offering of a pecuniary benefit to obtain nomination as a candidate for public office.

█ Each of these statutes carries a penal provision for its violation and for this reason, we decline to address the applicability of these statutes in this mandamus proceeding, where the prayer was to bar the respondent from the general election ballot under W.Va.Code, 3–8–7. Furthermore, it is clear under *State ex rel. Booth v. Board of Ballot Commissioners*, 156 W.Va. 657, 196 S.E.2d 299 (1973), that mandamus does not lie to resolve disputed factual claims involving violations of our election law, particularly where they involve penal statutes

in which the burden of proof is beyond a reasonable doubt.

For the foregoing reasons, we conclude that the relief prayed for by the relator is denied, and that the rule to show cause heretofore issued is dismissed.

Writ Dismissed.

McHUGH, C.J., and McGRAW, J., concur in part and dissent in part and reserve the right to file concurring and dissenting opinions.

HARSHBARGER, J., deeming himself disqualified, did not participate in this proceeding.

McHUGH, Chief Justice, concurring in part and dissenting in part:

The proceeding before this Court, as with many original proceedings, is replete with factual disputes regarding the financial reporting provisions of article 8, chapter 3 of the *West Virginia Code*. Although the records in original proceedings before this Court have traditionally been limited, it is my opinion that this case should have been referred to a special master or commissioner for findings of fact as provided by Rule 14(a) of the Rules of Appellate Procedure West Virginia Supreme Court of Appeals.

Of particular concern to me is the lack of a development of facts supporting the conclusions reached by the majority in sections III and IV. After adequate fact finding, the result may be the same, and if the facts support that result, I would concur. I do, however, caution the reader to beware of the precedential value of this case.

### ORDER

Justice McGraw withdraws his dissenting opinion, previously filed herein, from publication by the West Publishing Company for the reason that the West Publishing Company has edited the same by refusing to publish said dissent in its entirety.*