No. 71–288.  LAIRD, SECRETARY OF DEFENSE, ET AL. *v.*
TATUM ET AL., 408 U. S. 1.  Motion to withdraw opinion
of this Court denied.  Motion to recuse, *nunc pro tunc,*
presented to MR. JUSTICE REHNQUIST, by him denied. ∎

Memorandum of MR. JUSTICE REHNQUIST.

Respondents in this case have moved that I disqualify
myself from participation.  While neither the Court nor
any Justice individually appears ever to have done so,
I have determined that it would be appropriate for me
to state the reasons which have led to my decision with
respect to respondents' motion.  In so doing, I do not
wish to suggest that I believe such a course would be
desirable or even appropriate in any but the peculiar
circumstances present here.[1]

Respondents contend that because of testimony that
I gave on behalf of the Department of Justice before
the Subcommittee on Constitutional Rights of the Judi-
ciary Committee of the United States Senate at its
hearings during the 92d Cong., 1st Sess., on Federal Data
Banks, Computers and the Bill of Rights (hereinafter
Hearings), and because of other statements I made in
speeches related to this general subject, I should have

---

[1] In a motion of this kind, there is not apt to be anything akin to
the "record" that supplies the factual basis for adjudication in
most litigated matters.  The judge will presumably know more
about the factual background of his involvement in matters that
form the basis of the motion than do the movants, but with the
passage of any time at all his recollection will fade except to the
extent it is refreshed by transcripts such as those available here.
If the motion before me turned only on disputed factual inferences,
no purpose would be served by my detailing my own recollection of
the relevant facts.  Since, however, the main thrust of respondents'
motion is based on what seems to me an incorrect interpretation of
the applicable statute, I believe that this is the exceptional case
where an opinion is warranted.

disqualified myself from participating in the Court's consideration or decision of this case. The governing statute is 28 U. S. C. § 455, which provides:

"Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein."

Respondents also cite various draft provisions of Standards of Judicial Conduct prepared by a distinguished committee of the American Bar Association, and adopted by that body at its recent annual meeting. Since I do not read these particular provisions as being materially different from the standards enunciated in the statute, there is no occasion for me to give them separate consideration.[2]

Respondents in their motion summarize their factual contentions as follows:

"Under the circumstances of the instant case, MR. JUSTICE REHNQUIST's impartiality is clearly questionable because of his appearance as an expert witness for the Justice Department in Senate hearings inquiring into the subject matter of the case, because of his intimate knowledge of the evidence underlying the respondents' allegations, and because of his public statements about the lack of merit in respondents' claims."

Respondents are substantially correct in characterizing my appearance before the Ervin Subcommittee as an "expert witness for the Justice Department" on the sub-

---

[2] See S. Exec. Rep. No. 91–12, Nomination of Clement F. Haynsworth, Jr., 10–11.

ject of statutory and constitutional law dealing with the authority of the Executive Branch to gather information. They are also correct in stating that during the course of my testimony at that hearing, and on other occasions, I expressed an understanding of the law, as established by decided cases of this Court and of other courts, which was contrary to the contentions of respondents in this case.

Respondents' reference, however, to my "intimate knowledge of the evidence underlying the respondents' allegations" seems to me to make a great deal of very little. When one of the Cabinet departments of the Executive Branch is requested to supply a witness for the congressional committee hearing devoted to a particular subject, it is generally confronted with a minor dilemma. If it is to send a witness with personal knowledge of every phase of the inquiry, there will be not one spokesman but a dozen. If it is to send one spokesman to testify as to the department's position with respect to the matter under inquiry, that spokesman will frequently be called upon to deal not only with matters within his own particular bailiwick in the department, but with those in other areas of the department with respect to which his familiarity may be slight. I commented on this fact in my testimony before Senator Ervin's Subcommittee:

> "As you might imagine, the Justice Department, in selecting a witness to respond to your inquiries, had to pick someone who did not have personal knowledge in every field. So I can simply give you my understanding . . . ." Hearings 619.

There is one reference to the case of *Tatum* v. *Laird* in my prepared statement to the Subcommittee, and one reference to it in my subsequent appearance during a

colloquy with Senator Ervin. The former appears as follows in the reported hearings:

> "However, in connection with the case of *Tatum* v. *Laird,* now pending in the U. S. Court of Appeals for the District of Columbia Circuit, one printout from the Army computer has been retained for the inspection of the court. It will thereafter be destroyed." Hearings 601.

The second comment respecting the case was in a discussion of the applicable law with Senator Ervin, the chairman of the Subcommittee, during my second appearance.

My recollection is that the first time I learned of the existence of the case of *Laird* v. *Tatum,* other than having probably seen press accounts of it, was at the time I was preparing to testify as a witness before the Subcommittee in March 1971. I believe the case was then being appealed to the Court of Appeals by respondents. The Office of the Deputy Attorney General, which is customarily responsible for collecting material from the various divisions to be used in preparing the Department's statement, advised me or one of my staff as to the arrangement with respect to the computer print-out from the Army Data Bank, and it was incorporated into the prepared statement that I read to the Subcommittee. I had then and have now no personal knowledge of the arrangement, nor so far as I know have I ever seen or been apprised of the contents of this particular print-out. Since the print-out had been lodged with the Justice Department by the Department of the Army, I later authorized its transmittal to the staff of the Subcommittee at the request of the latter.

At the request of Senator Hruska, one of the members of the Subcommittee, I supervised the preparation of a memorandum of law, which the record of the hearings indicates was filed on September 20, 1971. Respondents refer to it in their petition, but no copy is attached, and the hearing records do not contain a copy. I would expect such a memorandum to have commented on the decision of the Court of Appeals in *Laird* v. *Tatum*, treating it along with other applicable precedents in attempting to state what the Department thought the law to be in this general area.

Finally, I never participated, either of record or in any advisory capacity, in the District Court, in the Court of Appeals, or in this Court, in the Government's conduct of the case of *Laird* v. *Tatum*.

Respondents in their motion do not explicitly relate their factual contentions to the applicable provisions of 28 U. S. C. § 455. The so-called "mandatory" provisions of that section require disqualification of a Justice or judge "in any case in which he has a substantial interest, has been of counsel, is or has been a material witness . . . ."

Since I have neither been of counsel nor have I been a material witness in *Laird* v. *Tatum*, these provisions are not applicable. Respondents refer to a memorandum prepared in the Office of Legal Counsel for the benefit of MR. JUSTICE WHITE shortly before he came on the Court, relating to disqualification. I reviewed it at the time of my confirmation hearings and found myself in substantial agreement with it. Its principal thrust is that a Justice Department official is disqualified if he either signs a pleading or brief or "if he actively participated in any case even though he did not sign a pleading or brief." I agree. In both *United States* v. *United States District Court*, 407 U. S. 297 (1972), for which I was not officially responsible in the Department

but with respect to which I assisted in drafting the brief, and in *S&E Contractors* v. *United States,* 406 U. S. 1 (1972), in which I had only an advisory role which terminated immediately prior to the commencement of the litigation, I disqualified myself. Since I did not have even an advisory role in the conduct of the case of *Laird* v. *Tatum,* the application of such a rule would not require or authorize disqualification here.

This leaves remaining the so-called discretionary portion of the section, requiring disqualification where the judge "is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein." The interpretation and application of this section by the various Justices who have sat on this Court seem to have varied widely. The leading commentator on the subject is John P. Frank, whose two articles, Disqualification of Judges, 56 Yale L. J. 605 (1947), and Disqualification of Judges: In Support of the Bayh Bill, 35 Law & Contemp. Prob. 43 (1970), contain the principal commentary on the subject. For a Justice of this Court who has come from the Justice Department, Mr. Frank explains disqualification practices as follows:

> "Other relationships between the Court and the Department of Justice, however, might well be different. The Department's problem is special because it is the largest law office in the world and has cases by the hundreds of thousands and lawyers by the thousands. For the most part, the relationship of the Attorney General to most of those matters is purely formal. As between the Assistant Attorneys General for the various Departmental divisions, there is almost no connection." *Supra,* 35 Law & Contemp. Prob., at 47.

Indeed, different Justices who have come from the Department of Justice have treated the same or very

similar situations differently. In *Schneiderman* v. *United States*, 320 U. S. 118 (1943), a case brought and tried during the time Mr. Justice Murphy was Attorney General, but defended on appeal during the time that Mr. Justice Jackson was Attorney General, the latter disqualified himself but the former did not. 320 U. S., at 207.

I have no hesitation in concluding that my total lack of connection while in the Department of Justice with the defense of the case of *Laird* v. *Tatum* does not suggest discretionary disqualification here because of my previous relationship with the Justice Department.

However, respondents also contend that I should disqualify myself because I have previously expressed in public an understanding of the law on the question of the constitutionality of governmental surveillance. While no provision of the statute sets out such a provision for disqualification in so many words, it could conceivably be embraced within the general language of the discretionary clause. Such a contention raises rather squarely the question of whether a member of this Court, who prior to his taking that office has expressed a public view as to what the law is or ought to be, should later sit as a judge in a case raising that particular question. The present disqualification statute applying to Justices of the Supreme Court has been on the books only since 1948, but its predecessor, applying by its terms only to district court judges, was enacted in 1911. Mr. Chief Justice Stone, testifying before the Judiciary Committee in 1943, stated:

> "And it has always seemed to the Court that when a district judge could not sit in a case because of his previous association with it, or a circuit court of appeals judge, it was our manifest duty to take the same position." Hearings Before Committee on the Judiciary on H. R. 2808, 78th Cong., 1st Sess.,

24 (1943), quoted in Frank, *supra,* 56 Yale L. J., at 612 n. 26.

My impression is that none of the former Justices of this Court since 1911 have followed a practice of disqualifying themselves in cases involving points of law with respect to which they had expressed an opinion or formulated policy prior to ascending to the bench.

Mr. Justice Black while in the Senate was one of the principal authors of the Fair Labor Standards Act; indeed, it is cited in the popular-name index of the 1970 edition of the United States Code as the "Black-Connery Fair Labor Standards Act." Not only did he introduce one of the early versions of the Act, but as Chairman of the Senate Labor and Education Committee he presided over lengthy hearings on the subject of the bill and presented the favorable report of that Committee to the Senate. See S. Rep. No. 884, 75th Cong., 1st Sess. (1937). Nonetheless, he sat in the case that upheld the constitutionality of that Act, *United States* v. *Darby,* 312 U. S. 100 (1941), and in later cases construing it, including *Jewell Ridge Coal Corp.* v. *Local 6167, UMW,* 325 U. S. 161 (1945). In the latter case, a petition for rehearing requested that he disqualify himself because one of his former law partners argued the case, and Justices Jackson and Frankfurter may be said to have implicitly criticized him for failing to do so.[3] But to my knowledge his Senate role with respect to the Act was never a source of criticism for his participation in the above cases.

Mr. Justice Frankfurter had, prior to coming to this Court, written extensively in the field of labor law. The Labor Injunction which he and Nathan Green wrote was considered a classic critique of the abuses by the fed-

[3] See denial of petition for rehearing in *Jewell Ridge Coal Corp.* v. *Local 6167, UMW,* 325 U. S. 897 (1945) (Jackson, J., concurring).

eral courts of their equitable jurisdiction in the area of labor relations. Professor Sanford H. Kadish has stated:

> "The book was in no sense a disinterested inquiry. Its authors' commitment to the judgment that the labor injunction should be neutralized as a legal weapon against unions gives the book its energy and direction. It is, then, a brief, even a 'downright brief' as a critical reviewer would have it." Labor and the Law, in Felix Frankfurter The Judge 153, 165 (W. Mendelson ed. 1964).

Justice Frankfurter had not only publicly expressed his views, but had when a law professor played an important, perhaps dominant, part in the drafting of the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. §§ 101–115. This Act was designed by its proponents to correct the abusive use by the federal courts of their injunctive powers in labor disputes. Yet, in addition to sitting in one of the leading cases interpreting the scope of the Act, *United States* v. *Hutcheson,* 312 U. S. 219 (1941), Justice Frankfurter wrote the Court's opinion.

Mr. Justice Jackson in *McGrath* v. *Kristensen,* 340 U. S. 162 (1950), participated in a case raising exactly the same issue that he had decided as Attorney General (in a way opposite to that in which the Court decided it). 340 U. S., at 176. Mr. Frank notes that Mr. Chief Justice Vinson, who had been active in drafting and preparing tax legislation while a member of the House of Representatives, never hesitated to sit in cases involving that legislation when he was Chief Justice.

Two years before he was appointed Chief Justice of this Court, Charles Evans Hughes wrote a book entitled The Supreme Court of the United States (Columbia University Press, 1928). In a chapter entitled Liberty, Property, and Social Justice he discussed at some length the doctrine expounded in the case of *Adkins* v. *Children's Hospital,* 261 U. S. 525 (1923). I think that one

would be warranted in saying that he implied some reservations about the holding of that case. See pp. 205, 209–211. Nine years later, Mr. Chief Justice Hughes wrote the Court's opinion in *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379 (1937), in which a closely divided Court overruled *Adkins.* I have never heard any suggestion that because of his discussion of the subject in his book he should have recused himself.

Mr. Frank summarizes his view of Supreme Court practice as to disqualification in the following words:

> "In short, Supreme Court Justices disqualify when they have a dollar interest; when they are related to a party and, more recently, when they are related to counsel; and when the particular matter was in one of their former law offices during their association; or, when in the government, they dealt with the precise matter and particularly with the precise case; otherwise, generally no." *Supra,* 35 Law & Contemp. Prob., at 50.

Not only is the sort of public-statement disqualification upon which respondents rely not covered by the terms of the applicable statute, then, but it does not appear to me to be supported by the practice of previous Justices of this Court. Since there is little controlling authority on the subject, and since under the existing practice of the Court disqualification has been a matter of individual decision, I suppose that one who felt very strongly that public-statement disqualification is a highly desirable thing might find a way to read it into the discretionary portion of the statute by implication. I find little to commend the concept on its merits, however, and I am, therefore, not disposed to construe the statutory language to embrace it.

I do not doubt that a litigant in the position of respondents would much prefer to argue his case be-

fore a Court none of whose members had expressed the views that I expressed about the relationship between surveillance and First Amendment rights while serving as an Assistant Attorney General. I would think it likewise true that counsel for Darby would have preferred not to have to argue before Mr. Justice Black; that counsel for Kristensen would have preferred not to argue before Mr. Justice Jackson; [4] that counsel for the United States would have preferred not to argue before Mr. Justice Frankfurter; and that counsel for West Coast Hotel Co. would have preferred a Court which did not include Mr. Chief Justice Hughes.

The Term of this Court just past bears eloquent witness to the fact that the Justices of this Court, each seeking to resolve close and difficult questions of constitutional interpretation, do not reach identical results. The differences must be at least in some part due to differing jurisprudential or philosophical propensities.

MR. JUSTICE DOUGLAS' statement about federal district judges in his dissenting opinion in *Chandler* v. *Judicial Council*, 398 U. S. 74, 137 (1970), strikes me as being equally true of the Justices of this Court:

"Judges are not fungible; they cover the constitutional spectrum; and a particular judge's emphasis may make a world of difference when it comes to rulings on evidence, the temper of the courtroom, the tolerance for the proffered defense, and the like. Lawyers recognize this when they talk about 'shopping' for a judge; Senators recognize this when they are asked to give their 'advice and consent' to judicial appointments; laymen recognize this

---

[4] The fact that Mr. Justice Jackson reversed his earlier opinion after sitting in *Kristensen* does not seem to me to bear on the disqualification issue. A judge will usually be required to make any decision as to disqualification before reaching any determination as to how he will vote if he does sit.

> when they appraise the quality and image of the judiciary in their own community."

Since most Justices come to this bench no earlier than their middle years, it would be unusual if they had not by that time formulated at least some tentative notions that would influence them in their interpretation of the sweeping clauses of the Constitution and their interaction with one another. It would be not merely unusual, but extraordinary, if they had not at least given opinions as to constitutional issues in their previous legal careers. Proof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias.

Yet whether these opinions have become at all widely known may depend entirely on happenstance. With respect to those who come here directly from private life, such comments or opinions may never have been publicly uttered. But it would be unusual if those coming from policymaking divisions in the Executive Branch, from the Senate or House of Representatives, or from positions in state government had not divulged at least some hint of their general approach to public affairs, if not as to particular issues of law. Indeed, the clearest case of all is that of a Justice who comes to this Court from a lower court, and has, while sitting as a judge of the lower court, had occasion to pass on an issue that later comes before this Court. No more compelling example could be found of a situation in which a Justice had previously committed himself. Yet it is not and could not rationally be suggested that, so long as the cases be different, a Justice of this Court should disqualify himself for that reason. See, *e. g.,* the statement of Mr. Justice Harlan, joining in *Lewis* v. *Manufacturers National Bank,* 364 U. S. 603, 610 (1961). Indeed, there is weighty authority for this proposition even when the cases are

the same. Mr. Justice Holmes, after his appointment to this Court, sat in several cases which reviewed decisions of the Supreme Judicial Court of Massachusetts rendered, with his participation, while he was Chief Justice of that court. See *Worcester* v. *Street R. Co.,* 196 U. S. 539 (1905), reviewing 182 Mass. 49 (1902); *Dunbar* v. *Dunbar,* 190 U. S. 340 (1903), reviewing 180 Mass. 170 (1901); *Glidden* v. *Harrington,* 189 U. S. 255 (1903), reviewing 179 Mass. 486 (1901); and *Williams* v. *Parker,* 188 U. S. 491 (1903), reviewing 174 Mass. 476 (1899).

Mr. Frank sums the matter up this way:

> "Supreme Court Justices are strong-minded men, and on the general subject matters which come before them, they do have propensities; the course of decision cannot be accounted for in any other way." *Supra,* 35 Law & Contemp. Prob., at 48.

The fact that some aspect of these propensities may have been publicly articulated prior to coming to this Court cannot, in my opinion, be regarded as anything more than a random circumstance that should not by itself form a basis for disqualification.[5]

Based upon the foregoing analysis, I conclude that the applicable statute does not warrant my disqualification in this case. Having so said, I would certainly concede that fair-minded judges might disagree about the matter. If all doubts were to be resolved in favor of disqualification, it may be that I should disqualify myself

---

[5] In terms of propriety, rather than disqualification, I would distinguish quite sharply between a public statement made prior to nomination for the bench, on the one hand, and a public statement made by a nominee to the bench. For the latter to express any but the most general observation about the law would suggest that, in order to obtain favorable consideration of his nomination, he deliberately was announcing in advance, without benefit of judicial oath, briefs, or argument, how he would decide a particular question that might come before him as a judge.

simply because I do regard the question as a fairly debatable one, even though upon analysis I would resolve it in favor of sitting.

Here again, one's course of action may well depend upon the view he takes of the process of disqualification. Those federal courts of appeals that have considered the matter have unanimously concluded that a federal judge has a duty to *sit* where *not disqualified* which is equally as strong as the duty to *not sit* where *disqualified*. *Edwards* v. *United States,* 334 F. 2d 360, 362 n. 2 (CA5 1964); *Tynan* v. *United States,* 126 U. S. App. D. C. 206, 376 F. 2d 761 (1967); *In re Union Leader Corp.,* 292 F. 2d 381 (CA1 1961); *Wolfson* v. *Palmieri,* 396 F. 2d 121 (CA2 1968); *Simmons* v. *United States,* 302 F. 2d 71 (CA3 1962); *United States* v. *Hoffa,* 382 F. 2d 856 (CA6 1967); *Tucker* v. *Kerner,* 186 F. 2d 79 (CA7 1950); *Walker* v. *Bishop,* 408 F. 2d 1378 (CA8 1969). These cases dealt with disqualification on the part of judges of the district courts and of the courts of appeals. I think that the policy in favor of the "equal duty" concept is even stronger in the case of a Justice of the Supreme Court of the United States. There is no way of substituting Justices on this Court as one judge may be substituted for another in the district courts. There is no higher court of appeal that may review an equally divided decision of this Court and thereby establish the law for our jurisdiction. See, *e. g., Tinker* v. *Des Moines School District,* 258 F. Supp. 971 (SD Iowa 1966), affirmed by an equally divided court, 383 F. 2d 988 (CA8 1967), certiorari granted and judgment reversed, 393 U. S. 503 (1969). While it can seldom be predicted with confidence at the time that a Justice addresses himself to the issue of disqualification whether or not the Court in a particular case will be closely divided, the disqualification of one Justice of this Court raises the possibility of an affirmance of the judgment below by an

equally divided Court. The consequence attending such a result is, of course, that the principle of law presented by the case is left unsettled. The undesirability of such a disposition is obviously not a reason for refusing to disqualify oneself where in fact one deems himself disqualified, but I believe it is a reason for not "bending over backwards" in order to deem oneself disqualified.

The prospect of affirmance by an equally divided Court, unsatisfactory enough in a single case, presents even more serious problems where companion cases reaching opposite results are heard together here. During the six months in which I have sat as a Justice of this Court, there were at least three such instances.[6] Since one of the stated reasons for granting certiorari is to resolve a conflict between federal courts of appeals, the frequency of such instances is not surprising. Yet affirmance of each of such conflicting results by an equally divided Court would lay down "one rule in Athens, and another rule in Rome" with a vengeance. And since the notion of "public statement" disqualification that I understand respondents to advance appears to have no ascertainable time limit, it is questionable when or if such an unsettled state of the law could be resolved.

The oath prescribed by 28 U. S. C. § 453 that is taken by each person upon becoming a member of the federal judiciary requires that he "administer justice without respect to persons, and do equal right to the poor and to the rich," that he "faithfully and impartially discharge and perform all the duties incumbent upon [him] . . . agreeably to the Constitution and laws of the United States." Every litigant is entitled to have his case heard by a judge mindful of this oath. But neither the oath, the disqualification statute, nor the

---

[6] *Branzburg* v. *Hayes,* 408 U. S. 665 (1972); *Gelbard* v. *United States,* 408 U. S. 41 (1972); *Evansville Airport* v. *Delta Airlines Inc.,* 405 U. S. 707 (1972).

practice of the former Justices of this Court guarantees a litigant that each judge will start off from dead center in his willingness or ability to reconcile the opposing arguments of counsel with his understanding of the Constitution and the law. That being the case, it is not a ground for disqualification that a judge has prior to his nomination expressed his then understanding of the meaning of some particular provision of the Constitution.

Based on the foregoing considerations, I conclude that respondents' motion that I disqualify myself in this case should be, and it hereby is, denied.[7]

---

[7] Petitioners in *Gravel* v. *United States*, 408 U. S. 606 (1972), have filed a petition for rehearing which asserts as one of the grounds that I should have disqualified myself in that case. Because respondents' motion in *Laird* was addressed to me, and because it seemed to me to be seriously and responsibly urged, I have dealt with my reasons for denying it at some length. Because I believe that the petition for rehearing in *Gravel*, insofar as it deals with disqualification, possesses none of these characteristics, there is no occasion for me to treat it in a similar manner. Since such motions have in the past been treated by the Court as being addressed to the individual Justice involved, however, I do venture the observation that in my opinion the petition insofar as it relates to disqualification verges on the frivolous. While my peripheral advisory role in *New York Times Co.* v. *United States*, 403 U. S. 713 (1971), would have warranted disqualification had I been on the Court when that case was heard, it could not conceivably warrant disqualification in *Gravel*, a different case raising entirely different constitutional issues.