**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Sir Mario OWENS, Defendant–Appellant.**

No. 09CA0145.

Colorado Court of Appeals, Div. A.

April 16, 2009.

As Modified on Denial of Rehearing June 25, 2009.

John W. Suthers, Attorney General, Catherine P. Adkisson, Assistant Solicitor General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Kathleen A. Lord, Chief Appellate Deputy Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge BERNARD.

Sir Mario Owens was convicted of two counts of first degree murder, for which death sentences were imposed, and several other lesser felony offenses. He has filed an appeal with this court concerning the lesser offenses and a motion requesting us to determine whether we have jurisdiction over this appeal. In light of the unitary review statute vesting the supreme court with exclusive appellate jurisdiction in death penalty cases, we dismiss the appeal.

## I. Background

Defendant was sentenced to two death sentences for the two murders and to sixty-five years in the Department of Corrections for the lesser offenses. On January 22, 2009, defendant filed a motion to determine whether this court has jurisdiction over his appeal from judgments on the lesser charges and a motion for a thirty-day extension of time to file a notice of appeal. On February 11, 2009, we deferred ruling on the motion to determine jurisdiction until defendant filed a notice of appeal. Defendant filed a notice of appeal with this court on February 23, 2009, that lists all of the convictions, but which also states that the murder convictions are "not subject to this appeal." The prosecution filed a motion to dismiss the appeal on March 3, 2009.

Relying on specific language in the unitary review statute, defendant contends that we have jurisdiction over his appeal from the judgments on the lesser charges. We disagree.

## II. Analysis

### A. Standards of Statutory Review

Construction of a statute is a question of law. *People v. Golden,* 140 P.3d 1, 4 (Colo.App.2005). Our duty is to give effect

to the legislature's intent. To determine this intent, we look first to the plain and ordinary meaning of the language of the statute before consulting other principles of statutory construction. *People v. Banks*, 9 P.3d 1125, 1127 (Colo.2000). We read the words and phrases employed in context, and we construe them "according to their common usage." *Bostelman v. People*, 162 P.3d 686, 690 (Colo.2007).

We examine the statute as a whole in order to give "consistent, harmonious and sensible effect to all of its parts," because we presume that the legislature intended all of a statute to be effective. *People v. Davis*, 218 P.3d 718, 723 (Colo.App. 2008) (quoting *Bd. of County Comm'rs v. Costilla County Conservancy Dist.*, 88 P.3d 1188, 1192 (Colo. 2004)). We eschew interpretations that defeat the General Assembly's obvious intent, *Klinger v. Adams County Sch. Dist. No. 50*, 130 P.3d 1027, 1031 (Colo.2006), or that would lead to illogical or absurd results, *Frazier v. People*, 90 P.3d 807, 811 (Colo.2004).

The rule of lenity requires us to resolve ambiguities in a penal code in favor of defendants. *See id.* However, this rule is only applied as a last resort, and we will not employ it if we are able to discern the legislature's intent. *Id.*

### B. Relevant Statutes and Court Rules

#### 1. Statutes

##### a. 1994 Amendments

In 1994, the General Assembly urged the supreme court to adopt an expedited process to review for

class 1 felony convictions where the death penalty has been imposed and any order by the district court granting or denying postconviction relief in such cases. It is the general assembly's intent that the Colorado supreme court give priority to cases in which a sentence of death has been imposed over other cases before the court [with one exception not relevant here].

§ 16–12–101.5(1), C.R.S.2008 (adopted in Ch. 262, sec. 1, 1994 Colo. Sess. Laws 1473).

The act that produced this statement of legislative intent also:

· Amended section 16–12–101.5(2), C.R.S. 2008, to require that almost all challenges to the conviction and sentence in the "direct appeal of any class 1 felony case in which a conviction is entered and in which a sentence of death is imposed" must be included in the defendant's brief "at the time such brief is filed with the supreme court"; and

· Added section 13–4–102(1)(h), C.R.S.2008, which states that the court of appeals does not have jurisdiction over "[c]ases appealed from the district court granting or denying postconviction relief in a case in which a sentence of death has been imposed."

Ch. 262, secs. 1 & 3, 1994 Sess. Laws 1473–74.

##### b. 1997 Amendments

The legislature added the statutes establishing unitary review in death penalty cases (the unitary review statute, or the URS) in 1997. §§ 16–12–201 to –210, C.R.S.2008 (adopted in Ch. 268, sec. 1, 1997 Colo. Sess. Laws 1573–82). As pertinent here, the legislative declaration for the URS, found in section 16–12–201, states:

(1) The general assembly hereby declares that the purpose of this part 2 is to establish an expedited system of unitary review of class 1 felony cases in which a death sentence is imposed.

(2) The general assembly finds that enactment of this part 2 will accomplish the following goals . . .

(c) Allowing for the full and fair examination of all legally cognizable postconviction and appellate issues by the trial court and the Colorado supreme court; and

(d) Eliminating, to the fullest extent possible, unreasonable and unjust delays in the resolution of postconviction issues by combining and reducing the number of proceedings in class 1 felony cases.

Section 16–12–202(1) establishes the URS as the "only procedure for challenging a sentence of death or the conviction that resulted in the sentence of death." Section 16–12–207(2) states:

Any appeal to the Colorado supreme court filed by the defendant pursuant to this part 2 [the URS] shall consolidate and resolve, in one proceeding, all direct appeal and postconviction review appeal issues.

Section 16–12–203(1) defines "direct appeal" as

the appeal to the Colorado supreme court of any issues raised at the entry of a guilty plea, before trial, at trial, at the penalty phase hearing, or in a motion for new trial.

Section 16–12–203(5) defines "postconviction review appeal" as "the appeal to the Colorado supreme court of any issues raised in postconviction review proceedings."

Our supreme court must review the propriety of all death sentences under section 18–1.3–1201(6)(a), C.R.S.2008. At the same time the legislature enacted the URS, the legislature amended section 18–1.3–1201(6)(a) by adding the following sentence: "The supreme court shall combine its review pursuant to this subsection (6) with consideration of any appeal that may be filed pursuant to [the URS]." Ch. 268, sec. 2, § 16–11–103(6)(a), 1997 Colo. Sess. Laws 1582.

The URS also directs the supreme court to adopt rules to establish procedures governing the "postconviction review and unitary appeal process" created by the URS. § 16–12–208(1). These rules are adopted to address, among other issues, filing of notices of appeal, certification of the appellate record, and the filing of briefs "in the supreme court." § 16–12–208(2)(i)–(k).

The URS provides that, as a general matter, "the Colorado appellate rules govern the procedures to be followed in appeals to the Colorado supreme court of trial court rulings" under the URS. § 16–12–208(4). The legislature urged the supreme court to render its decisions reviewing "class 1 felony convictions where the death penalty has been imposed" expeditiously, and repeated its intent that the supreme court give priority to cases in which the death penalty has been imposed. § 16–12–208(5).

### 2. Crim. P. 32.2

Crim. P. 32.2, effective January 1, 1998, was the response to the legislature's urging in the URS that the supreme court adopt rules implementing the URS. The purpose of Crim. P. 32.2 includes creating a "fair, just and expeditious procedure" for conducting appellate review of direct appeals "in class one felony cases in which a sentence of death is imposed." Crim. P. 32.2(a). A notice of appeal for direct appeal and postconviction review "shall be filed by unitary notice in the supreme court." Crim. P. 32.2(c)(1). "Any direct appeals," "any" postconviction appeals, and the review required by section 18–1.3–1201(6)(a) "shall be consolidated and resolved in one proceeding before the supreme court." Crim. P. 32.2(c)(3).

### C. Conclusion

■ Section 13–4–102(1), C.R.S.2008, imbues the court of appeals with initial jurisdiction over "appeals from final judgments of the district courts." We conclude that this general grant of jurisdiction has been modified by specific limitations established by the legislature. *See B.G.'s, Inc. v. Gross*, 23 P.3d 691, 696 (Colo.2001) (when statutes dealing with the same subject cannot be reconciled, a more specific statute prevails as an exception to a general one).

We reach this conclusion by interpreting the language of the URS in context, according to its common usage, in order to discover the legislature's intent. We examine section 16–12–101.5(2), section 18–1.3–1201(6)(a), and the URS in its entirety to give those sections sensible effect, and we avoid constructions that would defeat the legislature's intent. This interpretive process yields five reasons supporting our conclusion that we do not have jurisdiction over this appeal.

First, the General Assembly repeatedly used the word "case" when describing the supreme court's review. §§ 16–12–101.5(1) (supreme court to give priority to "cases" in which death penalty has been imposed), 16–12–101.5(2) (referring to any appeal of a class one felony "case"), 16–12–201(1) (purpose of the URS is to establish unitary review of class one felony "cases"), 16–12–201(2)(d) (purpose of the URS is to eliminate unreasonable and unjust delays in resolution of postconviction issues in class one felony "cases"), 16–12–208(5) (supreme court to give

priority to "cases" in which death penalty has been imposed).

The word "case" is defined as "[a] civil or criminal proceeding, action, suit, or controversy at law or in equity." *Black's Law Dictionary* 228 (8th ed.2004). The word "case" thus refers to the entirety of an individual criminal proceeding, and our constitution and statutes repeatedly use it in that context. *E.g.*, Colo. Const. art. II, § 19 (grounds for denying bail in certain "cases"); Colo. Const. art. II, § 23 (right to jury trial in criminal "cases"); Colo. Const. art. VI, § 9 (district courts have original jurisdiction in criminal "cases"); § 16–6–201(1), C.R.S.2008 (judge may be disqualified to try a "case"); § 16–10–102, C.R.S.2008 (when jury panel exhausted in criminal "cases"); § 16–10–104, C.R.S.2008 (peremptory challenges in capital "cases"); § 18–1.3–406(3), C.R.S.2008 (referring to a "case" in which the accused is charged with a crime of violence); *see also People v. Chamberlin*, 74 P.3d 489, 490 (Colo. App.2003) (records could not be sealed when, although felony counts were dismissed, defendant pled guilty to misdemeanor counts, and thus the criminal case was not completely dismissed). Therefore, under the URS, death penalty appeals involve the entire case, not merely the conviction for the class one felony that led to the imposition of a death sentence.

Second, the supreme court must consider the propriety of each death sentence, and this review must be combined with "consideration of any appeal that may be filed pursuant to [the URS]." § 18–1.3–1201(6)(a). Under the URS, a "direct appeal" requires the supreme court to review "any issues" before, during, or after trial, and a "postconviction appeal" mandates that the supreme court review "any issues" raised in postconviction review proceedings. *See* § 16–12–203(1), (4); *see also* §§ 16–12–101.5(2) ("all challenges" to death sentence and conviction shall be included in the brief filed with the supreme court), 16–12–201(2)(c) (purpose of the URS to allow for full and fair examination "of all legally cognizable postconviction and appellate issues"), 16–12–207(2) (any appeal to the supreme court shall consolidate and resolve

"all direct appeal and postconviction review appeal issues").

Generally, when used in a statute, the adjective "any" means "all." *Winslow v. Morgan County Comm'rs*, 697 P.2d 1141, 1142 (Colo.App.1985). Thus, as used in the URS, the plain meaning of the phrase "any issues" includes within it all issues arising before, during, or after trial, in a case in which a death sentence is imposed. The universe of "all issues" would include within in it the subset of issues arising out of charges or convictions involving offenses other than class one felonies.

Third, the General Assembly indicated that the URS is designed to combine review of all trial and postconviction issues in one appeal. §§ 16–12–201(2)(c) (purpose of the URS is to allow for full and fair examination of "all legally cognizable postconviction and appellate issues by ... the Colorado supreme court"), 16–12–207(2) (any appeal to the supreme court "shall consolidate and resolve, in one proceeding, all direct appeal and postconviction review appeal issues"). Review by the court of appeals of any issues arising out of a case in which a death sentence has been imposed, even if those issues only concern convictions for offenses other than class one felonies, would undermine the legislative goal of consolidating all direct appeal and postconviction issues in one proceeding before the supreme court.

Fourth, the URS expresses the General Assembly's intention that appellate review of death penalty cases should be expeditious. *See* §§ 16–12–101.5(1) & 16–12–201(1), (2)(d). This clear statement of legislative intent weighs heavily against dividing a death penalty case into two parts, to be resolved piecemeal by two appellate courts. This is particularly so because the supreme court likely would grant certiorari to review the court of appeals' decision concerning lesser felonies in order to fulfill the legislature's mandate that the supreme court decide any and all legally cognizable issues in death penalty cases. Such two-tiered review carries with it the potential for delay stemming from the supreme court's examination of the court of appeals' decision after the supreme court had resolved the rest of the appeal, and is incon-

sistent with the legislative desire that the supreme court give priority to resolving appeals in death penalty cases and decide them in an expedited manner.

Fifth, section 13–4–102(1)(h) expressly divests the court of appeals of jurisdiction over appeals from postconviction proceedings in cases in which the death penalty has been imposed. When this provision is combined with the language of section 16–12–101.5 and the URS, the legislature has made plain that it does not want the court of appeals to resolve issues arising from cases in which the death penalty has been imposed. *See Musick v. Woznicki*, 136 P.3d 244, 249 (Colo. 2006) (legislature has the authority to delineate the court of appeals' jurisdiction; thus, the supreme court looks "to the language of jurisdictional statutes . . . to discern the extent of the court of appeals' jurisdiction").

Crim. P. 32.2 supports the preceding reasoning because its language appears to mirror the URS.Crim. P. 32.2(a) refers to expeditious review of class one felony "cases" in which the death penalty has been imposed. Crim. P. 32.2(c)(1) requires a unitary notice of appeal. Crim. P. 32.2(c)(3) states that direct appeals, postconviction review appeals, and the supreme court's mandatory review shall be consolidated in one proceeding before the supreme court.

We are not persuaded by defendant's argument that the use of the phrase "class 1 felony conviction" in the URS eliminates issues concerning lesser felonies from its statutory scope. It is true that (1) section 16–12–202(1) states that the URS and the supreme court's rules adopted under the URS are the only procedure for "challenging a sentence of death or the conviction that resulted in the sentence of death"; (2) section 16–12–202(2) provides that the URS does not apply to "class 1 felony cases in which a sentence of death is not sought or to class 1 felony convictions for which the death penalty is not imposed"; and (3) section 16–12–202(3) indicates that the URS applies to "any class 1 conviction for which the death penalty is imposed."

■ However, in Colorado, the death penalty can only be imposed upon a conviction of a class one felony. § 18–1.3–

401(1)(a)(V)(A), C.R.S.2008. Thus, the context of the reference to a "class 1 felony conviction" establishes a threshold requirement for the statute's application, rather than limiting the issues or convictions that can be reviewed in a case in which a death sentence has been imposed. The language on which defendant relies merely indicates that the URS is only triggered when a defendant has been sentenced to death in a class one felony case. *See People v. Richardson*, 58 P.3d 1039, 1042 (Colo.App.2002) (because death sentence was not imposed, court of appeals had jurisdiction over appeal in murder case).

■ Last, we disagree with defendant's argument that the absence of any reference to the URS in the Colorado Appellate Rules in general, and in C.A.R. 4(d) in particular, has some effect on the question whether we have jurisdiction over his appeal. C.A.R. 4(d)(1) echoes the language of section 18–1.3–1201(6)(a), indicating that the supreme court reviews the propriety of death sentences. Further, we look to relevant statutes, not to "court-created procedural rules," to determine the extent of our jurisdiction. *Musick*, 136 P.3d at 249; *see* § 16–12–202(1) (the URS and the supreme court rules adopted pursuant to the URS "establish the only procedure for challenging a sentence of death or the conviction that resulted in the sentence of death").

The appeal is dismissed.

## III.  Petition for Rehearing

Defendant has filed a petition for rehearing from our order dismissing his appeal. It is partially based on requests that Judge Bernard recuse himself from the consideration of this appeal, and that we reconstitute the panel considering the appeal with another judge. We have considered the petition for rehearing in its entirety, and we deny it. In addition, we modify the opinion by adding this section III to explain our conclusion that the facts defendant alleges do not require Judge Bernard to recuse himself, and that, as a result, we need not consider defendant's request that we reconstitute the panel.

## A. Affidavit

■ Section 16–6–201(3), C.R.S.2008, states that, in a criminal case, a motion to recuse a judge must be supported by the affidavits of two credible persons listing the facts upon which the motion is based. Defendant did not provide us with such affidavits. Normally, therefore, the motion to recuse would be legally insufficient. *People in Interest of S.G.,* 91 P.3d 443, 448 (Colo.App. 2004).

However, in light of the rare and serious circumstances of this case, we choose to address the motion to recuse on its merits. *See United States v. Kelley,* 712 F.2d 884, 888 (1st Cir.1983); *S.G.,* 91 P.3d at 448 (division of this court addressed merits of motion, and then recognized that, had the "assertions in the motion ... been sufficient, the motion had fatal procedural flaws"); *cf. United States v. Pearson,* 203 F.3d 1243, 1276–77 (10th Cir.2000)(although a motion to recuse was not filed in the trial court, appellate court addressed it on appeal).

We do so for two reasons. First, Judge Bernard is personally aware of the facts upon which defendant's motion is based, and he does not dispute them.

Second, we anticipate that defendant would immediately supplement his motion with affidavits should we deny his motion because no affidavits have been supplied. Thus, judicial economy weighs heavily in favor of resolving this issue now so that review of defendant's convictions and sentences by the supreme court will not be further delayed. *See* § 16–12–201(2)(d) (one purpose of the URS is to eliminate "unreasonable and unjust delays in the resolution of postconviction issues by combining and reducing the number of proceedings in class 1 felony cases").

## B. General Principles

■ It is fundamental to our system of justice that a judge be free of bias. If a judge has a bias that will, in all probability, interfere with his or her ability to be fair to a party, the judge cannot preside over the case. *People v. Julien,* 47 P.3d 1194, 1197 (Colo.2002). This requirement applies whether the bias is actual or apparent.

*Wilkerson v. District Court,* 925 P.2d 1373, 1375–76 (Colo.1996). Indeed,

> [e]ven if a judge is convinced of his or her own impartiality, disqualification is nonetheless required if circumstances compromise the appearance of fairness and impartiality, such that the parties and the public are left with substantial doubt as to the ability of the judge to fairly and impartially resolve pending litigation.

*People v. Schupper,* 124 P.3d 856, 858 (Colo. App.2005), *aff'd,* 157 P.3d 516 (Colo.2007).

■ It is, however, a judge's duty to sit on a case unless a reasonable person could infer from the facts that the judge would be prejudiced against a party. *People v. Crumb,* 203 P.3d 587, 593 (Colo.App. 2008)(*cert. granted* Mar. 16, 2009); *see also Nichols v. Alley,* 71 F.3d 347, 351 (10th Cir. 1995)("[W]e are mindful that a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require.").

■ A reasonable person in this context is one who is a "well-informed, thoughtful and objective observer, rather than [a] hypersensitive, cynical, and suspicious person." *Schupper,* 124 P.3d at 858 (quoting *United States v. Jordan,* 49 F.3d 152, 156 (5th Cir.1995)). The law requires the use of a reasonable person standard in this context to discourage judge-shopping. *In re Mason,* 916 F.2d 384, 385–86 (7th Cir.1990)(Easterbrook, J.); *see also In re Antar,* 71 F.3d 97, 101 (3d Cir.1995)("[W]e remain ever mindful that attacks on a judge's impartiality may mask attempts to circumvent that judge's anticipated adverse decision.").

Statutes and the Code of Judicial Conduct set forth factors judges must consider when deciding whether to recuse themselves from cases. Section 16–6–201(1), C.R.S.2008, lists specific factors, including, in subsection (1)(d), that the judge is "in any way" interested in the case, or prejudiced with respect to the case itself, the parties, or their counsel. Crim. P. 21(b)(1) is identical.

Canon 3(C)(1) of the Colorado Code of Judicial Conduct states that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might rea-

sonably be questioned, including but not limited to" enumerated situations. This Canon is accompanied by an official comment, which states that "a judge formerly employed by a governmental agency ... should disqualify himself or herself in a proceeding if the judge's impartiality might reasonably be questioned because of such association."

### C. Defendant's Argument

■■ Defendant contends that Judge Bernard must recuse himself because he was a prosecutor who had tried death penalty cases unrelated to defendant's case, and because he played a significant role in the drafting and passage of the URS in 1997, including testifying, on behalf of the Colorado District Attorneys' Council, before both houses of the General Assembly and before our supreme court about the URS. Applying *Wilkerson,* we treat these facts as true. However, we disagree with defendant's conclusion that these facts mandate that Judge Bernard recuse himself from this appeal, and, as a result, that we must reconstitute the panel considering it.

Defendant was tried for murders that occurred in June 2005; he was convicted in May 2008; and he was sentenced to death in June 2008. Thus, the crime occurred eight years after the URS was drafted, discussed, and enacted; the conviction and death sentences took place eleven years thereafter; and this court was asked to interpret whether the URS barred defendant's appeal twelve years thereafter. Although, at the time of its passage, the URS referred to murders resulting in death sentences, no one could have then known that it would be applied to the specific facts of defendant's case because defendant's case did not exist.

Thus, defendant's argument is only premised on the general requirement, found in C.J.C. 3(C)(1), that a judge should recuse when "the judge's impartiality might reasonably be questioned," as amplified by the official comment concerning the effect of prior governmental service. Defendant does not claim that, under section 16–6–201(1)(d), Judge Bernard is interested in this case, or prejudiced with respect to the case itself, the parties, or their counsel.

### D. Analysis

■■ A judge does not have an obligation to recuse from a case because he or she worked in a prosecutor's office before taking the bench, unless he or she had acquired "personal knowledge of disputed evidentiary facts concerning the proceeding, [performed] some supervisory role over the attorneys who [were] prosecuting the case, or [had] some role in the investigation and prosecution of the case." *Julien,* 47 P.3d at 1198.

In reaching its conclusion in *Julien,* our supreme court stated that it will consider precedent from federal and state courts when construing C.J.C. 3(C)(1), as long as the judicial canons or statutes in those other jurisdictions are similar to ours. *Id.* The court then examined two parts of a federal statute, 28 U.S.C. § 455(a) and (b)(3), that fit this requirement of similarity.

Subsection (a) requires federal judges to recuse themselves "in any proceeding in which [their] impartiality might reasonably be questioned." This standard is identical to the general standard enunciated in C.J.C. 3(C)(1).

Subsection (b)(3) requires federal judges to recuse themselves when they have

served in governmental employment and in such capacity participated as counsel, advisor or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy.

This language brings to mind the official comment to C.J.C. 3(C)(1), which requires judges who have previously been "employed by a governmental agency" to disqualify themselves if their "impartiality might reasonably be questioned because of such association."

The *Julien* court noted that mere former association with a prosecutor's office, "absent other facts of association with the case," does not raise a reasonable question of judicial impartiality under subsection (a). *Id.* at 1198. Further, subsection (b)(3) requires a judge to recuse only when the judge has participated in, or has some knowledge of,

the case because of his or her prior employment as a governmental attorney. *Id.*

Our research has not revealed any Colorado authority that addresses the sorts of facts we face here, and defendant does not refer to any. Therefore, we examine cases from other jurisdictions that construe similar canons or statutes for guidance. *See id.*

In *Laird v. Tatum,* 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972), then Justice Rehnquist was asked to recuse himself from considering a case because (1) he had previously testified, as an expert witness on behalf of the Department of Justice, before a United States Senate Subcommittee about the constitutional and statutory authority of the Executive Branch to gather information; (2) he prepared a memorandum of law concerning the issue that was filed with the subcommittee; (3) he made comments on this subject in several speeches delivered before he was appointed to the Supreme Court; and (4) his testimony, and presumably the memorandum, referred to the Court of Appeals' decision in *Laird.* His opinion discussed the statutory predecessor to 28 U.S.C. § 455(a) and (b)(3).

Justice Rehnquist denied the request for several reasons. First, he did not have any role in litigating *Laird* at trial or on appeal, and he did not act as an advisor on the case. Second, his background as a lawyer with the Department of Justice was not, in itself, sufficient to justify recusal.

Third, he concluded the fact that he had made public statements about what the law was, or ought to be, before he joined the Court, was not a basis for recusal.

Since most Justices come to this bench no earlier than their middle years, it would be unusual if they had not by that time formulated at least some tentative notions which would influence them in their interpretation of the sweeping clauses of the Constitution and their interaction with one another. It would be not merely unusual, but extraordinary, if they had not at least given opinions as to constitutional issues in their previous legal careers. Proof that a Justice's mind at the time he joined the court was a complete tabula rasa in the area of constitutional adjudication would

be evidence of lack of qualification, not lack of bias.

*Id.* at 835.

Justice Rehnquist supported this point by referring to several instances in which Justices did not disqualify themselves when cases presented legal issues about which they had expressed opinions or formulated policy. For example, Justice Black, when a United States Senator, was a principal author of the Fair Labor Standards Act; he subsequently sat in the case that upheld the Act's constitutionality. Justice Frankfurter, when a law professor, expressed opinions about labor law and helped to draft a federal labor statute; he wrote the Supreme Court's opinion determining the scope of that statute. Chief Justice Vinson, when a United States Representative, drafted tax legislation; he later sat on cases involving it.

Reasoning similar to that employed by Justice Rehnquist in *Laird* has been echoed by the Supreme Court and by federal circuit and district courts. E.g.:

- *Mistretta v. United States,* 488 U.S. 361, 406–07, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("That federal judges participate in the promulgation of [the federal sentencing] guidelines does not affect their or other judges' ability impartially to adjudicate sentencing issues.");

- *Baker & Hostetler LLP v. United States Dep't of Commerce,* 471 F.3d 1355, 1358 (D.C.Cir.2006)("[J]udges who previously participated in policy matters and provided policy advice in government do not ordinarily recuse in litigation involving those policy issues.");

- *Buell v. Mitchell,* 274 F.3d 337, 345–46 (6th Cir.2001)(state legislator sponsored death penalty law under which defendant was convicted, and, after becoming a federal judge, reviewed defendant's habeas corpus petition; "[S]ponsorship of a law [while a state legislator] is similar to the expression of an opinion on a legal issue, which does not create the appearance of impropriety.");

- *United States v. Boyd,* 208 F.3d 638, 647 (7th Cir.2000) (head of the state police supervised investigation into gang activi-

ty and participated in a press conference concerning arrests arising out of the investigation, and, after becoming a federal district court judge, presided over a case that subsequently came into being), vacated on other grounds, 531 U.S. 1135, 121 S.Ct. 1072, 148 L.Ed.2d 949 (2001);

- *Carter v. West Publ'g Co.,* No. 99–11959–EE, 1999 WL 994997, at *9 (11 th Cir. Nov.1, 1999) (unpublished) (Tjoflat, J.) ("Courts have uniformly rejected the notion that a judge's previous advocacy for a legal, constitutional, or policy position is a bar to adjudicating a case, even when that position is directly implicated in the case before the court.");
- *Del Vecchio v. Illinois Dep't of Corrections,* 31 F.3d 1363, 1377 n. 3 (7th Cir. 1994) (prosecutor supervised prosecution of defendant, and, after becoming a state judge, presided over another case involving same defendant);
- *United States v. Wright,* 873 F.2d 437, 446–47 (1st Cir.1989) (then Judge Breyer concluded that he would not recuse himself from issues involving federal sentencing guidelines although he had been a member of the commission that drafted them);
- *Shaw v. Martin,* 733 F.2d 304, 316 (4th Cir.1984)("One who has voted as a legislator in favor of a statute permitting the death penalty in a proper case cannot thereafter be presumed disqualified to hear capital cases as a judge or predisposed to give a death sentence in any particular case.");
- *Wessmann v. Boston School Committee,* 979 F.Supp. 915, 917–18 (D.Mass.1997) (membership in civil rights committee while an attorney did not require judge to recuse from school desegregation case);
- *In re Wyoming Tight Sands Antitrust Cases,* 726 F.Supp. 288, 292 (D.Kan.1989)(written testimony provided to Federal Power Commission fifteen years before while an attorney did not require judge to recuse from antitrust case).

*See also Voss v. State,* 856 N.E.2d 1211, 1218–19 (Ind.2006)("A lawyer's representation of criminal defendants facing the death penalty does not provide a rational inference that the lawyer, if subsequently serving as a judge, will be biased or prejudiced in cases involving the death penalty."); Richard E. Flamm, *Judicial Disqualification, Recusal and Disqualification of Judges* §§ 10.2 (Life Experiences) at 260–64, 10.7 (Disqualification for Views About Law or Policy) at 271–74, 10.9 (Expression of a Legal Opinion) (2d ed.2007) (collecting cases).

Some of these cases apply 28 U.S.C. § 455(a). *Buell,* 274 F.3d at 345–48; *Carter,* 1999 WL 994997 at *2–9; *Wessmann,* 979 F.Supp. at 916–17; *Wyoming Tight Sands Antitrust Cases,* 726 F.Supp. at 292. Others apply 28 U.S.C. § 455(b)(3). *Baker & Hostetler LLP,* 471 F.3d at 1357–58; *Boyd,* 208 F.3d at 647; *see also* 13D Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Richard D. Freer, Joan E. Steinman & Catherine D. Struve, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 3544 n. 7 (3d ed.2008) (subsection (b)(3) was "deliberately drawn not to require disqualification in a situation such as the one that confronted Justice Rehnquist in *Laird v. Tatum* ").

We think these cases provide valuable guidance for two reasons. First, they analyze the species of facts at issue here: an attorney or legislator participates in drafting a statute, or testifies about it before a legislative body, or expresses a public opinion about it, or votes on it, and then that person is later called upon to interpret the statute as a judge. Second, some of these cases involve subsections of the federal statute that the *Julien* court considered to be similar to C.J.C. 3(C)(1).

Relying on *Julien, Laird,* and the federal cases cited above, we conclude that Judge Bernard's background as a prosecutor who tried death penalty cases unrelated to this one, plus his involvement with the URS twelve years ago, are not the sort of factors associated with this appeal that would raise a reasonable question about his judicial impartiality in the mind of an observer who is well-informed, thoughtful, and objective.

The petition for rehearing is denied, including the request that Judge Bernard recuse himself from the consideration of this appeal. As a result, we need not consider whether it is necessary to reconstitute the panel considering it.

Chief Judge DAVIDSON and Judge GRAHAM concur.